

U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described**.

**Signed November 20, 2006**

**United States Bankruptcy Judge**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| e2 COMMUNICATIONS, INC. | § | CASE NO. 02-30574-BJH11 |
| | § | |
| Debtor. | § | |
| | § | |
| | § | |
| | § | |
| e2 CREDITORS TRUST and | § | |
| e2 LITIGATION TRUST, | § | |
| by and through their | § | |
| trustee, STEVEN C. METZGER, | § | |
| | § | |
| Plaintiffs | § | |
| | § | |
| -against- | § | CASE NO. 05-03542-BJH |
| | § | |
| STEPHENS, INC., | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

Page 1

The Court tried this adversary proceeding (the "Adversary") over 8 days, commencing on August 14, 2006 and concluding on September 14, 2006. At the conclusion of the trial, the Court asked the parties to file revised proposed findings of fact and conclusions of law (the "Revised Findings") in light of the actual evidentiary record made at trial. Due to other competing commitments, the parties asked to have until October 20, 2006 within which to file the Revised Findings. The Revised Findings were filed on that date, at which time the Court took the Adversary under advisement. The Court has core jurisdiction over the parties and the issues raised in the Adversary in accordance with 28 U.S.C. §§ 1334 and 157(b). This Memorandum Opinion and Order contains the Court's findings of fact and conclusions of law in accordance with Bankruptcy Rule 7052.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

Briefly, this dispute centers around a failed merger transaction that closed in November, 2001 between e2 Communications, Inc. ("e2" or the "Debtor") and e-Synergies, Inc. ("e-Synergies"). The plaintiffs are the e2 Creditors Trust and the e2 Litigation Trust (collectively, the "Trusts"), acting through their trustee, Steven C. Metzger ("Metzger"). (PTO, p. 15, ¶¶ 36 & 37).[1] The Trusts were created pursuant to an amended plan of reorganization for the Debtor, which was confirmed on February 10, 2003 (the "Plan"). (PTO, p. 14, ¶ 34). Pursuant to Section 6.1 of the Plan, the e2 Creditors Trust was designated as the representative of the Debtor, to prosecute claim objections and to seek the recovery of preferential transfers, pursuant to § 1123(b)(3)(B) of the Bankruptcy Code. (PTO, p. 15, ¶ 38). The Plan further provided that all "claims, rights and causes of action that have

---

[1]The Court will cite to the parties' Joint Pretrial Order (docket no. 103) as PTO. So, this citation is to the Pretrial Order, page 15, paragraphs 36 and 37.

been or could have been brought by or on behalf of the Debtor arising before, on, or after the Petition Date . . ." are "preserved and retained for enforcement by the Litigation Trustee." (PTO, p. 15, ¶ 39). There is no dispute that the Plaintiffs own, and are legally entitled to assert, the claims stated against Defendant Stephens, Inc. ("Stephens") in the Adversary, which was filed against Stephens on July 7, 2005. (PTO, p. 15, ¶ 42).

Returning to the failed merger transaction and its history, on or about June 15, 2001, e2 and Stephens entered into an agreement (the "Contract") pursuant to which Stephens was retained by e2 to act as its "exclusive financial advisor." (P-66, p. 1). e2 considered other financial advisory firms, but ultimately decided to retain Stephens because Stephens was well qualified to provide the desired services and because Stephens had represented MessageMedia, another e-commerce business, in connection with its transaction with DoubleClick. (Tr. 1043/3-13; Tr. 1383/8-17; Tr. 1727/7-15).[2] The Contract was drafted by Stephens from a form commonly used in the financial advisory industry. (PTO, p. 12, ¶ 8). At the time it entered into the Contract, Stephens was one of the leading financial advisory firms in the country, (PTO, p. 12, ¶ 9), particularly with respect to the e-commerce industry. (Tr. 140/16-22). Stephens had no prior relationship with e2 or any member of e2's board of directors (the "Board") when it entered into the Contract. (Tr. 1382/17-1383/7). Under the terms of the Contract, Stephens was to advise e2 regarding "strategic alternatives" that might be available to e2. (P-66, p. 1). The services Stephens was to provide under the Contract included (i) identifying the possible strategic alternatives, (ii) evaluating the possible alternatives, (iii)

---

[2]Tr. refers to the trial transcript, the first number is a page reference, and the other numbers are line references. So, the citations here are to the trial transcript at p. 1043, lines 3-13; trial transcript at p. 1383, lines 8-17; and the trial transcript at p. 1727, lines 7-15. Transcript references in this Memorandum Opinion and Order are not intended to be exhaustive; rather, they are intended only to be illustrative.

presenting the possible alternatives to e2, (iv) assisting e2 in narrowing down the scope of the possible alternatives, and (v) assisting in the execution of whatever alternative e2 decided to pursue. (P-66). The "strategic alternatives" that Stephens was to consider for e2 included attempting to find a purchaser/business combination partner and/or new debt or equity financing. (P-66).

By mid-2001, the Board was interested in pursuing some form of business combination, sale, or financing transaction because e2 needed access to capital that was otherwise unavailable to it at that time.[3] (Tr. 1726/17-22; D-222 (communication to e2 shareholders explaining 2001 performance and events leading up to the merger with e-Synergies, and the strategic rationale for the merger); D-232 (shareholder communication advising that "[g]iven [e2's] current financial condition, without consummating the proposed transaction [the e-Synergies merger], management believes there is no viable alternative for the survival of the Company")). e2's business was in the e-commerce industry. Specifically, e2 "was engaged in the internet or technology business of providing software, hosting, and other email marketing and communications services, which enable its customers to create,

---

[3]To fund its start up, e2 raised approximately $22.1 million dollars through debt and equity financings. It raised $8.7 million through the issuance of common stock, $1.0 million through the issuance of Series A preferred stock, $5.2 million through the issuance of Series B preferred stock, $6.6 million through the issuance of Series C preferred stock, and $0.6 million through the issuance of demand notes. (D-252). As John Keene, e2's Vice President of Engineering and Chief Technical Officer ("Keene"), explained, Browne was "pretty key in the early stages, in bringing kind of – we were mostly funded through friends and family and acquaintances, and so he brought a fair number of investors that were acquaintances or friends of acquaintances to invest in e2 over those first few years." (Tr. 466/13-19). Several of e2's largest shareholders had representatives on the Board, including Farris, Cordes, McAndrews, Bray, and Bonner. Browne also invested and was named an advisory director. Historically, when e2 had needed cash, it had turned to these "friends and family."

However, a few months before Stephens was engaged, the outside directors of e2 had a serious falling out with Jeffery Farris, the founder and Chief Executive Officer of e2 ("Farris"). In summary, the outside directors did not believe that Farris was capable of taking e2 to the next level of business operations – *i.e.*, of leading e2 past the start-up stage, "Stage 1," and into "Stage 2." (Tr. 112/11-113/19). Accordingly, the outside directors asked Farris to step aside as e2's CEO, so that a "Stage 2" CEO could be retained to see e2 through its next phase of development – *i.e.*, getting ready to take the technology to market; "the technology needs to transition and become a product as opposed to a technology." (Tr. 103/4-17). Not surprisingly, Farris reacted very negatively to this suggestion, threatening the outside directors and refusing to step aside. (Tr. 113/5-14; Tr. 1013/6-1015/6). Because of this impasse with Farris, the outside directors and Browne were not interested in investing further funds in e2.

deploy, and monitor sophisticated email marketing campaigns and then respond to replies and automatically adapt to results." (PTO, p. 11, ¶¶ 1 & 2). As just noted, Farris was the founder of e2 and, at all times material to the claims asserted in the Adversary,[4] was its President and Chief Executive Officer. (PTO, p. 11, ¶ 3; P-50, p. 7). Similarly, during at least the Engagement Period, Jeff Cordes ("Cordes") was e2's Chief Operating Officer and Chief Financial Officer. (PTO, p. 12, ¶ 4; P-50, p. 7). Finally, during at least the Engagement Period, the Board was composed of Farris, Cordes, Ian Bonner ("Bonner"),[5] Bennie Bray ("Bray"),[6] and Brian McAndrews ("McAndrews").[7] (PTO, p. 12, ¶ 5; Tr. 1012/12-22; P-50, p. 7). Another person, Wade Browne ("Browne"),[8] played an important role in connection with the Stephens engagement and the failed e-Synergies transaction. Specifically, from September, 2000 through at least the Engagement Period, Browne was an advisory director of e2, (PTO, p. 12, ¶ 6; Tr. 705/22-24), and was actively involved in the negotiation of the possible merger of e2 with e-Synergies. (Tr. 212/3-7; D-130, p. 2).

At the time of Stephens' engagement, e2 was experiencing serious cash flow shortages. In fact, e2 had never experienced a positive cash flow in any month since its inception. (P-50

---

[4]The Parties agree that Stephens was engaged by e2 from June 15, 2001, through November 15, 2001, the date the merger with eSyngeries closed (the "Engagement Period").

[5]Bonner spent the last 27 years in the computer software industry. After spending 11 years at IBM, Bonner managed and ran four separate start up software companies in various parts of the high-technology industry, with a view to turning the companies around and taking them public or selling them to a larger company. (Tr. 75/1-9).

[6]Bray is an investor in different funds and companies. During the times relevant to this dispute, Bray was a partner in Monarch Capital Partners, a venture capital company ("Monarch Partners"). One of Monarch Partners' funds had invested in e2.

[7]During the times relevant to this dispute, McAndrews was the CEO and president of Avenue A, which was a major customer of, and investor in, e2. (Tr. 19/6-11).

[8]Browne is, and was during the times relevant to this dispute, a "registered investment advisor and registered representative." (Tr. 488/24-25). As noted previously, Browne was responsible for identifying many of the e2 investors. (*See supra* at n.3).

(shareholder update dated May 10, 2001 noting that "[c]ash burn drops quarter over quarter from $3.4 million to just under $ 1 million"); P-52 (investor update stating that "e2 has gone from a dream company that is nearly cash flowing with profitability in sight")). And, during 2001, e2 was continuing to sustain monthly negative cash flow in excess of that which it had projected. (Tr. 181/9-17; P-32; D-115; D-222). The Board was aware of e2's cash flow problem before Stephens was engaged. (D-34; D-222). From almost the inception of its engagement, Stephens knew that e2 had a serious cash flow problem. (Tr. 1393/7-14). e2's cash flow problem was a factor that Stephens considered as it performed its services under the Contract. (PTO, p.13, ¶ 19). Similarly, e2's cash flow problem was a factor that the Board considered when it evaluated prospective purchasers/business combination partners. (PTO, p. 13, ¶ 20).

e2's cash flow problems were so serious that Farris transferred over $600,000 to e2 during the Engagement Period.[9] (Tr. 1727/16-21; D-150). If Farris had not transferred these funds to e2, e2 would not have had sufficient cash to continue its operations through November 15, 2001, the date the e-Synergies merger closed. (Tr. 315/24-316/7; Tr. 370/11-22; Tr. 1727/16-21; D-222).

Other factors further complicated Stephens' search for strategic alternatives for e2. During 2001, the stock values of companies in the e-commerce market were declining. (Tr. 732/9-20; Tr. 1009/22-1010/2; Tr. 1389/14-23). From June through August, 2001, the e-commerce market was negative. (Tr. 1389/14-1390/2). By at least August, 2001, e2, as well as most other companies in the e-commerce market, were experiencing revenue slowdowns. (Tr. 181/9-17; Tr. 1726/23-25). The e-commerce market also experienced consolidation during the Engagement Period. (Tr. 315/18-20).

---

[9]Although not directly relevant here, a dispute developed between Farris and the outside directors regarding the nature of these advances. The outside directors understood that Farris was making further equity investments and Farris considered the advances loans, for which he later took collateral to secure repayment.

Finally, the manner in which e2's management operated e2 with respect to its use of cash caused a further diminishment in e2's value during the Engagement Period. (Tr. 1013/6-1015/6).

The combination of these problems made identifying a prospective purchaser/business combination partner for e2 more difficult. (Tr. 1407/20-25; Tr. 1422/21-1423/6; Tr. 1427/20-1428/25; D-64; D-70; D-101; D-124). Market conditions that had enabled deals in the e-commerce business sector to close prior to the Engagement Period worsened during the Engagement Period, making it difficult for Stephens to identify potential e2 purchasers/business combination partners. (Tr. 179/11-180/3; Tr. 1389/14-1390/17; Tr. 1391/4-1392/2). Finally, the terrorists' acts of September 11, 2001, had a negative impact on e2's revenues and assets, and made identifying a prospective purchaser/business combination partner or other viable strategic alternative more difficult for Stephens. (Tr. 316/22-317/11; Tr. 1389/14-1391/17).

Notwithstanding these problems, during the Engagement Period, Stephens explored both asset and stock transactions for e2, as well as other strategic alternatives. (Tr. 1456/2-19; Tr. 1727/22-1728/3; D-101; D-124; D-222; D-252, p. 8). In total, Stephens identified 29 prospective purchasers/business combination partners for e2. (PTO, p. 13, ¶ 21 (e-Syngeries "was one of almost 30 possible merger or acquisition candidates identified by Stephens"); D-101, D-103, D-251A).

At some point during the Engagement Period, the Board advised Stephens that it preferred for Stephens to identify potential merger candidates, pursuant to which the e2 shareholders would convey their e2 stock to the acquiring entity in exchange for stock in the acquiring entity (a "Stock Deal"), rather than potential asset purchasers (an "Asset Deal"). (Tr. 371/5-18; Tr. 875/9-14; Tr. 1185/15-1186/17; Tr. 1386/1-11; Tr. 1450/6-25; Tr.1451/14-19; D-89). Stephens followed the Board's advice and stated preference, and began focusing on possible Stock Deals. (Tr. 1386/9-11).

The Board members preferred a Stock Deal for an obvious reason – *i.e.*, that type of transaction was in their economic interest as e2 shareholders, and in the economic interest of various of their family members who were also e2 shareholders.  (Tr. 261/16-24; Tr. 492/11-493/5; Tr. 700/1-6; Tr. 717/8-13; Tr. 977/20-978/7; Tr. 979/6-8).  If a Stock Deal was successfully pursued, the existing e2 shareholders would receive stock in the acquiring company in exchange for their e2 shares, thereby enjoying the upside potential from the business combination.  In contrast, in an Asset Deal, the members of the Board (and their various family members) would have lost the entirety of their equity investments in e2, because e2's assets were worth less than its debts.  (Tr. 1010/3-6; Tr. 1793/8 -1794/11; Tr. 1727/22-1728/3).  Accordingly, the focus of the members of the Board during the Engagement Period with respect to a strategic alternative for e2 was on a Stock Deal in order to attempt to salvage their (and their family members') equity investments in e2.  (Tr. 317/12-19; Tr. 1038/15-1039/7; Tr. 1378/5-25; Tr. 1727/22-1728/3).

During the Engagement Period, Stephens also considered the possibility of e2 raising new capital from both external and internal sources.  (Tr. 1212/4-16; Tr. 1481/6-13; D-124).  But, e2 was unable to raise new capital from external sources given the existing market conditions in the e-commerce industry during the Engagement Period, (Tr. 1390/18 -1391/3), and the Board decided that this was not a viable strategic alternative.  (Tr. 316/11-21; Tr. 348/17-349/1; Tr. 659/20-660/11; Tr. 903/5-14; Tr. 1726/13-22; D-222).  Moreover, insider sources of new capital were unavailable to e2 during the Engagement Period due to the open hostility and hard feelings that existed between Farris on the one hand and the outside directors and Browne on the other hand.  (*See supra* at n.3).  While the outside directors and Browne had some conversations among themselves about the possibility of a further equity investment, there was never a written commitment to invest additional money in

e2 during the Engagement Period.[10]  (Tr. 753/13-23).  And, significantly, neither Browne nor any of the outside directors ever informed the Board or Stephens of any circumstance under which they might be willing to invest more money into e2 during the Engagement Period.  (Tr. 752/6-753/23; Tr. 1301/7-13; Tr. 1726/17-22).

After considering proposals from various potential purchasers or merger candidates, (D-78; D-101; D-124), at a Board meeting on September 4, 2001, the Board approved the signing of a letter of intent regarding a merger of e2 into e-Synergies.  (Tr. 336/11-338/8; D-125; D-141; D-145; D-146).  And, on or about September 7, 2001, e2 executed a letter of intent to merge with e-Synergies (the "Letter of Intent"). (PTO, p. 13, ¶ 22; D-141).  After signing the Letter of Intent, e2 and e-Synergies continued their respective due diligence.

On October 10, 2001, a telephonic meeting of the Board occurred.  (P-200).  Stephens participated in that meeting,  at which the Board "unanimously voted for certain resolutions relating to a merger between e2 and e-Synergies."  (PTO, p. 13, ¶ 23; *see also* P-200).  On that same date, the Board unanimously voted to recommend to the e2 shareholders that the shareholders vote in favor of the e2/e-Synergies merger.  (Tr. 363/7-20; P-200; D-222).  The Board also authorized Farris to execute the Plan and Agreement of Merger (the "Merger Agreement") on e2's behalf.  (D-224).  The Merger Agreement was entered into by and between e2 and e-Synergies as of October 12, 2001.  (PTO, p.13, ¶ 24).  In written communications to the e2 shareholders immediately following the October 10, 2001 Board meeting, the Board and the e2 management team recommended that the

---

[10]The only written communication Browne was able to identify about this so-called interest in a further equity investment was an email dated August 21, 2001 from Browne to Bonner.  The total amount discussed in the email was $340,000, well short of the amount of funding necessary to save e2, and long before the Closing Date.  (D-96; Tr. 808/11-810/4).

shareholders vote in favor of the merger.  (Tr. 239/18-21; Tr. 372/16-24; Tr. 1056/6-9; D-222; D-232).  And, the e2 shareholders subsequently approved the proposed e-Synergies merger.  (PTO, p. 13, ¶ 25).

After the Merger Agreement was signed, but before the transaction was required to be closed, Stephens continued to update e2 on the status of other purchasers/business combination partners previously considered and rejected by the Board.  (Tr. 686/15-687/14; D-266).  No better alternative was found, and on November 15, 2001 (the "Closing Date"), the merger of e2 and e-Synergies was closed and became effective (the "Merger"), (Tr. 364/8-14; Tr. 1137/10-14; D-274; D-278), and e2 became a wholly-owned subsidiary of e-Synergies.

While e2 continued to operate after the Merger, e-Synergies was unable to provide e2 with the liquidity it needed to successfully continue its business operations.  e2 continued to operate on a "hand-to-mouth" basis after the Closing Date.  (Tr. 461/11-462/2).  Payrolls were missed; the landlord locked e2 out of its office space; and payment problems persisted with Exodus, the key service provider for e2's business.  (Tr. 478/9-479/19; 485/15-17; P-329 at ¶ 7).

An involuntary Chapter 11 petition was filed against e2 on January 25, 2002 (the "Petition Date"), thereby initiating the bankruptcy case in which the Adversary is pending (the "Bankruptcy Case").  (PTO, p. 14, ¶ 31).  On February 14, 2002, e2 consented to the entry of an order for relief under Chapter 11.  (PTO, p. 14, ¶ 32).  On March 1, 2002, the Court appointed a Chapter 11 trustee for e2.  (PTO, p. 14, ¶ 33).  By Order entered on April 30, 2002, e2's assets were sold to Bluestreak.com, Inc. ("Bluestreak") for $2 million cash and royalty payments of between $600,000

and $2.12 million.[11]  (P-280, p. 2, § 1.2; Tr. 567/3-568/15).  And, by Order entered on February 10,

2003, the Court confirmed the Plan, which was proposed by e2's Chapter 11 trustee and Email

Partners, LLC, Monarch Partners' Venture Fund L.L.P. (Bray's company), Chris S. Carter, Bonner,

and Browne.  (PTO, pp. 14-15, ¶ 34).

    As part of the Bankruptcy Case, Stephens timely filed a proof of claim against e2 on May 13,

2002 (the "Stephens Claim"), (D-297), seeking to recover the fees and expenses it calculated to be

due and owing under the Contract.  During the trial, Stephens stipulated that the correct amount of

the Stephens Claim was $457,347.05.  (Tr. 1549/17-1550/7).

## II.    CONTENTIONS OF THE PARTIES

    In summary, the Plaintiffs contend that Stephens should be liable to them for: (i) breach of

the Contract, and (ii) breach of certain fiduciary duties owed to e2.  For these breaches of the

Contract and/or fiduciary duties, the Plaintiffs seek to recover compensatory damages, punitive

damages, and the disgorgement of Stephens' fee from the MessageMedia/Doubleclick merger.  The

Plaintiffs also seek disallowance of the Stephens Claim because (i) Stephens received payment of

the fee due it under the Contract through acceptance of a promissory note from e-Synergies, (ii)

Stephens cannot seek to enforce the Contract and collect the fee due it under the Contract because

it was in prior breach of the Contract, and (iii) Stephens cannot collect a fee because a breaching

fiduciary cannot collect a fee for its services.  Alternatively, if the Stephens Claim is otherwise

allowed, in whole or in part, the Plaintiffs seek to equitably subordinate it to the claims of other

unsecured creditors under § 510(c) of the Bankruptcy Code.

---

[11]When it purchased e2's assets, Bluestreak also hired about two-thirds of e2's former employees to operate the "business" it had just purchased.  (Tr. 465/15-466/3).  The total amount of cash collected from the sale to Bluestreak was $2.6 million.  (Tr. 568/18-20).

In response, Stephens (i) denies all of the Plaintiffs' claims, (ii) asserts various defenses to the Plaintiffs' claims, (iii) requests allowance of the Stephens Claim, and (iv) seeks indemnification from e2 under the indemnification provisions of the Contract for (a) any damages awarded against it in the Adversary, and/or (b) the fees and expenses it has incurred in defending itself from the Plaintiffs' claims.

Finally, the Plaintiffs contend that Stephens cannot recover on its indemnity claim because that claim is barred by (i) Article VIII of the Plan – *i.e.*, the Contract was an executory contract rejected under the Plan, and Stephens failed to timely assert its indemnification claim in accordance with the Plan's terms, (ii) Stephens' prior breaches of the Contract, (iii) Texas public policy, (iv) Stephens' gross negligence or willful misconduct, and/or (v) Stephens' failure to assert the claim in a timely fashion.

## III.  LEGAL ANALYSIS

The Court will analyze each of the Plaintiffs' claims before turning to Stephens' indemnification claim.

### A.  Plaintiffs' Breach of Contract Claim

In order to recover on their breach of contract claim, the Plaintiffs must establish that (i) the Contract is a valid and enforceable contract between e2 and Stephens; (ii) e2 and/or the Plaintiffs either performed, tendered performance, or were excused from performing under the Contract; (iii) Stephens breached the Contract; and (iv) Stephens' breach(es) of the Contract caused injury to e2. *Lewis v. Bank of Am. NA*, 343 F.3d 540, 544-45 (5th Cir. 2003), *cert. denied*, 540 U.S. 1213 (2004)) (citing *Palmer v. Espey Huston & Assocs., Inc.*, 84 S.W.3d 345, 353 (Tex. App.–Corpus Christi 2002, pet. denied) (citation omitted)).  Of course, the Plaintiffs must also establish their standing to sue

Stephens for breach of the Contract.

In order to establish standing to assert their breach of contract claim, the Plaintiffs must establish that they are in privity with Stephens with respect to the Contract. Privity is defined as a mutual or successive relationship to the same right of property. *C & C Partners v. Sun Explor. & Prod. Co.*, 783 S.W.2d 707, 722 (Tex. App.–Dallas 1989, writ denied), *disapproved on other grounds*, *Formosa Plastics Corp. USA v. Presido Eng'rs & Contractors*, 960 S.W.2d 41 (Tex. 1998) (citing *City of Dallas v. Brown*, 150 S.W.2d 129, 131 (Tex. Civ. App.–Dallas 1941, writ dism'd)). The parties do not dispute that e2 and Stephens were parties to a valid and enforceable contract. Moreover, the parties have stipulated that the Litigation Trust is the successor in interest to all of e2's claims, including the contract claims. (PTO, p. 15, ¶ 39). The e2 Creditors Trust has standing under Article VI of the Plan to assert all objections to claims otherwise available to e2's bankruptcy estate. (P-280, p. 6). The Court therefore finds that the Plaintiffs have standing to assert e2's breach of contract claim against Stephens.

Turning to the elements of a breach of contract claim, the parties have stipulated that the parties entered into the Contract, (PTO, p. 12, ¶ 7), which was a valid and binding contract governed by Texas law. The Contract was created from a form typically used by Stephens in its business. (PTO, p. 12, ¶ 8; Tr. 1203/15-24). The parties also agree that e2's engagement of Stephens under the Contract started in mid-June, 2001, (PTO, p. 12, ¶ 7), and ended on the Closing Date. The Court therefore finds in favor of the Plaintiffs with respect to the first element of their breach of contract claim.

Next, a party seeking recovery for breach of a contract must establish that it either performed under the contract, tendered performance under the contract, or was excused from performing its

contractual obligations. *Mead v. Johnson Group*, 615 S.W.2d 685, 689 (Tex. 1981). After reviewing the Contract, the Court finds that e2 had three obligations under the Contract: (1) to provide information to Stephens, or assist Stephens in obtaining information from prospective purchasers/business combination partners, (2) to pay Stephens' fees and expenses (under certain terms and conditions), and (3) to indemnify Stephens (under certain terms and conditions). (P-66).

With respect to its obligation to provide information to Stephens or to assist Stephens in obtaining information, the Court finds that e2 discharged this obligation. Stephens' most senior representative on the e2 engagement, Gary Ciuba ("Ciuba"), testified that e2's management was generally responsive to Stephens, engaged in a free-flow of information to Stephens, and generally provided accurate information to Stephens. (Tr. 1220/8-1223/22; Tr. 1439/4-6). Moreover, Stephens makes no complaint about e2's efforts to assist it in obtaining information from prospective purchasers/business combination partners.

With respect to e2's obligation to pay Stephens' fee under the Contract, and for the reasons explained more fully below, (*see infra* at pp. 43-44), the Court finds that Stephens agreed to accept a promissory note from e-Synergies in satisfaction of e2's obligation under the Contract to pay Stephens' fee. (Tr. 1256/19-1264/16). Accordingly, e2 was excused from paying Stephens' fee.

Finally, with respect to e2's obligation to indemnify Stephens, the Court finds that Stephens first asserted an indemnity claim when it filed its counterclaims against the Plaintiffs here – *i.e.*, to the extent that the Plaintiffs succeed on any of their claims against Stephens, Stephens asserts that it is entitled to be indemnified from that liability by e2 under the Contract, and should be indemnified for any fees and expenses it has incurred in defending itself in any event. However, as relevant to their breach of contract claim, the Plaintiffs assert, among other things, that Stephens' prior breaches

of the Contract excused e2 from any obligation to indemnify Stephens. Accordingly, the Court must analyze the Plaintiffs' contention that Stephens breached the Contract first, to which we now turn.

In order to decide whether Stephens is liable for breach of the Contract, the Court must first determine what conduct was required of Stephens. Then, the Court must determine if Stephens failed to perform as required. *See Meek v. Bishop Peterson & Sharp*, 919 S.W.2d 805, 808 (Tex. App.–Houston [14th Dist.] 1996, writ denied) (citing *Garza v. Southland Corp.*, 836 S.W.2d 214, 219 (Tex. App.–Houston [14th Dist.] 1992, no writ)). Specifically, under Texas law, "a breach of contract occurs when a party fails or refuses to perform an act or thing that he has expressly or impliedly promised to do." *See Fidelity Deposit Company of Maryland v. Stool*, 607 S.W.2d 17, 25 (Tex. App.–Tyler 1980, no pet.) (citing *Crutcher-Rolfs-Cummings v. Ballard*, 540 S.W.2d 380, 386 (Tex. Civ. App.–Corpus Christi 1976, writ ref'd n.r.e.); *Provident Sav. Life Assurance Soc'y of N.Y. v. Ellinger*, 164 S.W. 1024, 1026 (Tex. Civ. App.–Austin 1913, writ ref'd)). When determining what performance is required, all writings that pertain to the same transaction will be considered together, even if they were executed at different times and do not expressly refer to one another. *See Dewitt County Elec. Cooperative, Inc. v. Parks*, 1 S.W.3d 96, 103 (Tex. 1998). The Court will also imply duties in a contract when the facts show that the parties intended such duties to be a part of the contract. *See Bendalin v. Delgado*, 406 S.W.2d 897, 900 (Tex. 1966). Finally, Texas law requires that every party to a contract perform its promises with care, skill, reasonable expedience, and faithfulness. *See Sw. Bell Tel. Co. v. DeLanney*, 809 S.W.2d 493, 494 (Tex. 1991). A promissor therefore breaches a contract when it either fails to perform as promised or the method of its performance causes damage to the promissee. *See Jones v. Star Houston, Inc.*, 45 S.W.3d 350, 355 (Tex. App.–Houston [1st Dist.] 2001, no writ); *Entergy Gulf States, Inc. v. Akrotex, Inc.*, 40 S.W.3d

201, 204 (Tex. App.–Beaumont 2001, no pet.).

As relevant here, the Contract expressly states that Stephens will: (1) serve as "exclusive financial advisor;" (2) "assist . . . in exploring strategic alternatives;" (3) "if requested by the Board of Directors, render an opinion as to the fairness, from a financial point of view, of the consideration payable to the Company" in a proposed transaction; (4) engage in "investigation and analysis;" and (5) provide "advice" on a "formal and informal" basis. (P-66, pp. 1-2). These provisions were meant to give the Board and Stephens "some latitude" or "flexibility" as to what Stephens would be asked to "look into" as a part of the "iterative process of figuring out what the best strategic alternative might be." (Tr. 1213/10-1214/2; Tr. 1869/4-21). Making recommendations to e2 was part of Stephens' obligation to "advise" under the Contract. (Tr. 1230/11-20).

The Contract also stated that e2 would furnish Stephens, and would request that each prospective purchaser furnish Stephens, "such information as Stephens believes appropriate to its assignment," and that Stephens would "inquire into the reliability of the information . . . to the limited extent necessary to provide a reasonable basis for Stephens' analyses and opinion." (P-66, p. 2). Ciuba acknowledged that the purpose of these provisions was to require Stephens to ask for and review information it believed to be important and then to "give it a reality smell test," "to actually evaluate the information," and "decide whether or not it would be reasonable to rely on it for analyses and opinions." (Tr. 1223/18-1225/1). The analysis and evaluation required of Stephens under the Contract was to be undertaken from a financial, not a legal, point of view. (Tr. 148/6-149/3; Tr. 416/5-22). Stephens' expert witness, Richard Davis ("Davis"), acknowledged that these provisions also required Stephens to ask the questions necessary to "really get to know" both the needs of e2 and the capabilities of its would-be suitors to make sure that the suitors were capable of

meeting e2's needs.  (Tr. 1841/1-1844/25).

For the reasons explained more fully below, the Court concludes that Stephens performed the services it was required to perform under the Contract with the requisite care, skill, reasonable expedience, and faithfulness required by Texas law.  Accordingly, the Court concludes that Stephens did not breach the Contract.

Of Stephens' five express contractual obligations, (*see supra* at pp. 15-16), the Court can easily dispose of the first three.  It is undisputed that Stephens served as "exclusive financial advisor" to e2.  Moreover, Stephens clearly "assisted" e2 with respect to the consideration of "strategic alternatives."  The parties stipulated that "Stephens staffed [the e2 engagement] with people who possessed the appropriate level of expertise and who spent a sufficient number of personnel hours on the . . . work Stephens was performing." (PTO, p.12, ¶ 13). And, as previously found, Stephens identified and contacted 29 prospective purchasers/business combination partners.  Stephens' conduct in identifying these candidates was of a quality that was consistent with the conduct expected of them by e2 specifically and in the investment banking industry generally.  (Tr. 165/13-166/10; Tr. 168/8-169/8; P-327, p. 5).  Stephens performed such due diligence services regarding these candidates, including e-Synergies, that were appropriate and such services were in accordance with industry standards.  (Tr. 165/13-166/10; Tr. 168/8-169/8; Tr. 281/14-17; Tr. 1729/1-9; P-104; P-327, p. 5).  In short, Stephens properly performed its duties to e2 under the Contract with respect to identifying prospective purchasers/business combination partners.

While Stephens also considered and explored the possibility of obtaining new capital for e2 on a stand alone basis, the market conditions during the Engagement Period made that an unrealistic strategic alternative, as the Board ultimately concluded.  (D-222, p. 2).  Moreover, insider sources of

new capital were unavailable to e2 during the Engagement Period due to the open hostility and hard feelings that existed between Farris on the one hand and the outside directors and Browne (who had previously provided significant capital to fund e2's start-up) on the other hand.[12] (Tr. 1726/17-22; Tr. 752/6-753/23; Tr. 1301/7-13; D-143 (Avenue A declines to invest more); *see supra* at n.3). And, it is undisputed that Stephens was asked to, and did, issue a "fairness opinion" in connection with the e2/e-Synergies merger. (D-253; D-286).

Accordingly, and in essence, the Plaintiffs' breach of contract claim relates to Stephens' final two obligations under the Contract – *i.e.*, to (1) engage in "investigation and analysis" and (2) provide "advice" on a "formal and informal" basis to the Board, to which we now turn. In its simplest terms, the Plaintiffs contend that Stephens failed to properly advise the Board regarding the status of e-Synergies' fund-raising activities. Specifically, the Plaintiffs contend that Stephens failed to advise the Board that e-Synergies had not raised the cash necessary to address e2's liquidity needs and insure e2's continuing operations, such that the Merger would be successful and e2's creditors would be paid.

The Court begins its analysis by noting that Farris, the Chairman of the Board, President, and CEO of e2, testified simply and unequivocally that he understood that e-Synergies had not raised the cash necessary to address e2's liquidity needs as of the Closing Date – *i.e.*, the cash necessary to fund e2's ongoing operations and to pay e2's creditors when the Merger closed on November 15, 2001. (Tr. 1732/15-1733/13). Farris further testified no one from Stephens advised the Board that e-Synergies had raised new capital during the October 10, 2001 Board meeting. (Tr. 1732/15-23). Nor,

---

[12]While the outside directors contend that they were willing to provide new capital to e2 after the settlement was reached with Farris in connection with the Merger in mid-October, 2001, the Court rejects this contention for several reasons that are discussed hereinafter. (*See infra* at pp. 37-42).

to the best of Farris' knowledge, did anyone from Stephens advise any member of the Board that e-Synergies had raised new capital at any time after October 10, 2001. (Tr. 1733/7-10). Finally, Farris testified that Stephens provided e2 with all of the services required by the Contract, and that Stephens did its job well. (Tr. 1729/1-9). In short, Farris is unaware of any claims that e2 has against Stephens under the Contract or otherwise.

After considering Farris' testimony in its entirety, the Court concludes that from Farris' perspective, the Merger closed based upon the Board's belief that the needed funds would be raised by e-Synergies after the Closing Date, which unfortunately turned out to be untrue − *i.e.*, e-Synergies failed to raise the needed funds and the Merger was unsuccessful. However, Farris does not fault Stephens in any way for the Merger's lack of success.

Next, the Court notes an admission by the Plaintiffs. The Plaintiffs admit that early in the Board's consideration of e-Synergies as a potential merger candidate, the outside directors and Browne realized that e-Synergies was a start-up shell company with no real assets and operating revenue of its own. Specifically, on September 7, 2001, Jeff Miller, Avenue A's in-house legal counsel, clearly and succinctly evaluated the possible merger of e2 and e-Synergies as follows:

> I assume the Board has evaluated the alternatives again, and has agreed that this is the best deal available. It was my recommendation to go ahead with those (rather than Ptek, DCLK, or anything else) before I learned more about them. It is my strong feeling that there is no substantive business in [e-Synergies] today, and they are using an existing very small business base to try to raise capital. This company is mostly paper, and it will become even more paper in the short term. The Board should recognize and accept the risks that this deal won't close; that even if it does close, the value of the shares that it will hold is highly questionable; and that someone is going to have to put in some short-term $$ to keep e2 afloat [while] we find out if [e-Synergies] can raise any money, with no assurance that it will get anything back for those $$.

(D-146). Moreover, on September 17, 2001, Browne restated the problems with such a possible

merger as follows:

> It appears that nothing has changed since our discussion on Saturday. These guys
> are wasting our time and focus. Their stock is $0.90 today. What are they smoking?
> Where is their proof of financial capability. I would like some financial statements,
> please.

(D-162). So, what is clear, is that even the outside directors and Browne understood in mid-
September, 2001 that the possible merger of e2 and e-Synergies was risky, and that e-Synergies had
not raised the cash necessary to insure that e2's liquidity needs could be met going forward.

Thereafter, the parties agree that Browne and the Board instructed Stephens to undertake
further due diligence with respect to e-Synergies' financial status and its ability to raise the capital
e2 needed. What happened next is where the disagreement lies. Stephens contends that (i) it
continued its due diligence, (ii) it continued to ask e-Synergies for financial and other updates, (iii)
it provided the information it received to Browne and/or other Board members, and (iv) the Board
understood that e-Synergies had not raised the necessary funds when the Merger closed on
November 15, 2001. In contrast, the Plaintiffs contend that Stephens either (i) assured the Board that
e-Synergies had the ability to consummate the deal, or (ii) failed to communicate clearly the fact that
e-Synergies did not have the cash necessary to address e2's liquidity needs and insure the payment
of e2's creditors as of the Closing Date.

Bonner testified that Marc Alger ("Alger") of Stephens told the Board on September 4, 2001
that "there was no doubt [about e-Synergies ability to consummate the deal as described] but that
Stephens would continue to research the matter as part of their ongoing practice and if there was any
change they would let us know." (Tr. 206/19-207/3). Moreover, Bonner testified that Stephens told
the Board thereafter that "progress continued to be made by e-Synergies in raising the necessary
capital." (Tr. 434/21-435/3).

The Court discounts this testimony for several reasons. First, no other Board member who testified at trial corroborates Bonner's testimony about Alger's purported statement in September, 2001. Second, it makes no sense for Alger to have given the Board assurances about the success of e-Synergies' fund-raising efforts on September 4, 2001, as it was still very early in the due diligence process. Third, as just noted, both Avenue A's in-house counsel and Browne were clearly articulating their concerns to all Board members over e-Synergies apparent lack of financial wherewithal on September 7 and 17, 2001, respectively. Fourth, Farris disputes this testimony.[13] And fifth, even if Alger made the statements attributed to him, he never said that e-Synergies had, in fact, raised the necessary funds. A vague statement like "progress continues to be made" means very little, except that e-Synergies was continuing its fund-raising efforts.

Regarding the clarity of Stephens' advise to the Board regarding the status of e-Synergies' fund-raising activities, the Court notes that on October 24, 2001 in an internal communication to members of its fairness opinion committee, Stephens clearly articulated the status of e-Synergies' fund-raising activities when it told the committee that Stephens' fee could not be paid at closing as the Contract required. Specifically, Ciuba stated that:

> [a]fter a meeting with the buyer today it is apparent that they will not likely have the cash to pay our full fee at closing next week. They have undertaken money raising efforts on many fronts, including a $10 MM raise through one of their officers, Ted Mar, over in Asia, but none of those deals will close in time for our closing next week. Our fee is explicitly set out as part of the liabilities assumed by the buyer in an assumed liabilities schedule and as a material contract in the [definitive agreement]. I believe the buyer intends to pay us – they have the "want to," but may lack the "can do." My sense is that they may have $50,000 to $100,000 to pay us next week. They would probably agree to pay the rest over six months or when and

---

[13]Specifically, Farris testified that no assurances were provided by Stephens during the October 10, 2001 Board meeting or thereafter. (Tr. 1732/15-1733/13). In fact, Farris testified that he had been told that "e-Synergies had not raised their money yet." (Tr. 1732/24-1733/10). Of course, Stephens disputes Bonner's testimony, although Alger did not testify at trial.

if they complete a significant raise.

(D-251). In short, Ciuba advised his Stephens colleagues that e-Synergies did not have the cash to

pay Stephens' fee, and would not have the cash until e-Synergies completed its fund-raising

campaign.

In contrast, in its last formal update memorandum to the Board (dated September 3, 2001),[14]

Stephens' communicated that

> e-Synergies has a recently formulated business model and execution risk is high. e-
> Synergies still has to provide e2 with a better understanding of their current financial
> position and forecasted financial outlook.

(D-124, p. 3). And, according to the Plaintiffs, Stephens breached the Contract by not

communicating as clearly with e2 and its Board as it had communicated internally that e-Synergies

had not raised the necessary cash by the Closing Date.

While the Court agrees that Stephens could have articulated the status of e-Synergies' fund-

raising activities more succinctly and clearly to the outside directors, the Court cannot find that

Stephens breached the Contract by communicating with the Board in the way in which it did.[15] In

---

[14]The October 10, 2001 Board meeting was called on very short notice and was held telephonically. (D-219). Stephens participated in the meeting, but did not prepare a written update memorandum. (P-200). The Board authorized e2 to enter into a definitive agreement with e-Synergies at the October 10 meeting. (P-200). Although Stephens was in constant contact with Browne, Farris, Cordes, and various other e2 representatives between October 10 and the Closing Date, there was no further formal Board meeting after October 10, 2001 with respect to the Merger. (*See infra* at n.19).

[15]From June 15, 2001 until approximately September 4, 2001, Farris and/or Cordes were the Board's representative with respect to (i) communications between the Board and Stephens, and (ii) due diligence regarding potential purchasers/business combination partners and strategic alternatives. (Tr. 150/11-14; Tr. 340/4-341/1; Tr. 346/25-347/5; Tr. 1402/16-1403/4). From approximately September 4, 2001 through the end of the Engagement Period, Browne was designated by the Board as its representative with respect to these matters. (Tr. 306/20-307/3; Tr. 308/12-20; Tr. 340/4-341/1; Tr. 346/25-347/5; Tr. 1215/14-17; Tr. 1402/16-1403/4; D-126; D-130, p. 2 (stating that "Cordis and Farris "will cooperate with the negotiations with e-Synergies and agrees that Wade Browne will lead the transaction team.")).

It is typical for a financial advisor to communicate with a board of directors through a point person or representative. (Tr. 1402/10-17). The Board did not instruct Stephens to communicate any differently with Browne than it had with Farris and Cordes. (Tr. 1404/11-17). No particular member of the Board was designated as Browne's contact for purposes of transmitting information Browne obtained from Stephens about any

**Memorandum Opinion and Order**                                              **Page 22**

short, after considering the record as a whole, the Court finds that during the Engagement Period, Stephens communicated to the Board or its representative(s) all material information of which Stephens was aware. Moreover, the Court finds that the Board members either knew, or should have known from the information provided to them by Stephens, that e-Synergies had not raised the cash necessary to insure e2's ongoing operations and the payment of e2's creditors as of the Closing Date. The Court further finds that the Board proceeded with the Merger understanding the potential risks of failure attendant to the Merger. Finally, the Court finds that if any Board member did not understand the status of e-Synergies' fund-raising activities or the risks associated with the Merger as of the Closing Date, it was not because of any act or omission of Stephens.

Let us look first to some of the documents in the Board's possession as of the Closing Date to determine what the Board either knew or should have known. For example, in one of Stephens' first status memorandums dated August 24, 2001, Stephens advised the Board that "e-Synergies has a recently formulated business model and execution risk is high." (P-104, p. 4). The August 24 memorandum was discussed at a telephonic Board meeting on August 25, 2001. (Tr. 160/24- 161/19; P-107). A consolidating balance sheet for e-Synergies and its subsidiaries as of August 24, 2001 showed a cash balance of less than $174,000. (D-104).

---

purchaser/business combination partner or any strategic alternative. (Tr. 304/24-305/5; Tr. 1051/18-23).

    At all times during the Engagement Period, Stephens had reason to believe and did believe that information it communicated to any member of the Board or to Browne would be forwarded to the entire Board. (Tr. 754/21-755/2; Tr. 1051/4-6; Tr. 1402/10-1403/11; Tr. 1500/22-24). Browne had the ability to communicate with or send emails to all members of the Board. (Tr. 502/20-23). During the Engagement Period, Browne communicated to the Board all information he had regarding the Merger, including information about e-Synergies' financial condition. (Tr. 304/8-305/20; Tr. 535/19-536/7; Tr. 724/10-13; Tr. 868/21-25). During the Engagement Period, no member of the Board ever complained when it received information through Browne instead of directly from Stephens. (Tr. 747/11-748/4). Stephens relied on Farris, Cordes, and Browne to fulfill their responsibility of communicating to the Board all information they received regarding the Merger from Stephens. (Tr. 1403/8-14). Farris, Cordes, and/or Browne communicated with e-Synergies from time to time without the participation of a Stephens representative. The Board never requested that communications from Stephens be provided through any specific medium or in any particular manner.

Stephens issued another status memorandum to the Board dated September 3, 2001. (D-124). In that memorandum, Stephens repeated its earlier reminder that "e-Synergies has a recently formulated business model and execution risk is high," and went on to state that "e-Synergies still has to provide e2 with a better understanding of their current financial position and forecasted financial outlook." (*Id.*, p. 2). This memorandum was prepared for another telephonic meeting of the Board that occurred on September 4, 2001. And, notwithstanding the recognized lack of financial information from e-Synergies, the Board authorized the signing of the letter of intent with e-Synergies, understanding that further due diligence remained to be done. Thereafter, on September 23, 2001, Browne sent the outside directors various financial schedules relating to the possible combination of e-Synergies and e2. (D-179). Among them was a consolidating balance sheet as of August 31, 2001, which showed the cash position of e-Synergies and its subsidiaries to be unchanged – *i.e.*, e-Synergies had less than $174,000 on hand.[16]

As noted previously, a further telephonic meeting of the Board occurred on October 10, 2001, at which time the Board authorized the signing of the Merger Agreement. (*See supra* at n.14). And, on October 29, 2001, Alger of Stephens provided various due diligence documents to Browne, who forwarded the email, and its attachments, to Bray on the same date. (D-254). Included in the due diligence documents attached to Alger's email were e-Synergies' projections and a balance sheet. Even as late as October 29, 2001, however, the latest balance sheet that was available for e-Synergies was as of August 31, 2001. As Alger noted in his email "Tom [Ronk from e-Synergies] did not have a more current balance sheet as it is being completed concurrently with the audit. Please let me know

---

[16]While the consolidating balance sheet also showed a projected cash position following a hypothetical merger with e2 and another entity identified only as "Target # 1," the document is clear that it is simply a projection of what the cash position of the newly combined entities might look like.

**Memorandum Opinion and Order**                                                                 **Page 24**

if you have any questions."[17] (D-254). The August 31, 2001 balance sheet clearly showed that e-Synergies had less than $174,000 in cash as of that date. Significantly, Browne had seen that alarmingly low cash balance before – and had reacted rather strongly to it just five weeks earlier when he asked in an email to Stephens, "[w]hat are they [e-Synergies] smoking? Where is their proof of financial capability. I would like some financial statements please." (D-162).

The simple fact that e-Synergies had no more current balance sheet than August 31 in late October should have raised all sorts of red flags with Browne, as the person leading the e2 Merger team. And, of course, the substance of the August 31 balance sheet information should have been as troubling to Browne in late October as it had been in mid-September – i.e., e-Synergies had virtually no cash. And, according to Bonner, it was. After having his recollection refreshed, Bonner agreed that he testified in his deposition that Browne communicated to him prior to November 15, 2001 that e-Synergies did not have sufficient cash to pay the creditors of e2 after the closing. (Tr. 390/22-391/4). Bonner went on to testify on cross-examination at trial that he "knew that Mr. Browne didn't think that e-Synergies had sufficient cash on November the 2nd to pay all the creditors." (Tr. 391/5-8).

So, thirteen days prior to the Closing Date, an advisory director of e2 and the person leading the e2 Merger team, Browne, told an e2 director, Bonner, that a fundamental premise of the Merger could not be achieved – i.e., e2's creditors could not be paid because e-Synergies did not have sufficient cash to pay those creditors. Several conclusions and/or questions flow from this significant

---

[17]Browne was aware of the ongoing e-Synergies financial audit because of an earlier email from Ronk that Farris had forwarded to Browne on October 16, 2001. (D-243).

**Memorandum Opinion and Order**                                                                    **Page 25**

admission. First, Browne's trial testimony to the contrary is not credible.[18] Second, Browne and Bonner had a fiduciary duty to make sure that all of the other e2 directors were aware of Browne's conclusion. Accordingly, why didn't Browne and/or Bonner call for a further Board meeting so that this problem could be discussed? Bonner did not call such a meeting. (Tr. 452/21-22). Neither did Browne or anyone else. There was no further Board meeting prior to the Closing Date,[19] and both Browne and Bonner appear to have simply let the Merger close, knowing that e-Synergies did not have the necessary cash. The logical conclusion from these facts is that either Bonner and Browne breached their fiduciary duties by not telling the other Board members or there was nothing new to tell – *i.e.*, everyone already knew that e-Synergies had not completed its fund-raising efforts and the Merger was proceeding on the hope that e-Synergies would be successful in its efforts to raise the needed cash after the Closing Date, so that the Merger could be successful (as Farris essentially testified).

Let us look next to the Board's authorized communications to the e2 shareholders for an indication of what the Board knew. As previously found, after the Board voted to approve the Merger on October 10, 2001, the Board directed management to seek e2 shareholder approval of the Merger. (D-224; D-221, p. 6). Of significance, the communication to e2 shareholders in October, 2001, makes it clear that e-Synergies was still in the process of raising capital. Specifically, the shareholders were told that e-Synergies was in the process of "finishing their fund-raising." (D-222, p. 3). If Alger or anyone else at Stephens had told management or the Board that e-Synergies had

---

[18] Browne repeatedly testified that he was assured by Stephens that e-Synergies had the necessary funds to consummate the Merger.

[19] Bonner testified that he did not know why the Board did not have another meeting before the Closing Date to try to confirm if all the conditions had been met. (Tr. 452/16-20). Bonner also testified that, with the benefit of hindsight, it would have been prudent to do so. (Tr. 452/23-453/1).

**Memorandum Opinion and Order**                                                        **Page 26**

already raised the necessary cash, this communication to the shareholders should, and presumably would, have reflected that fact. Instead, e2's shareholders were told that the fund-raising activities necessary to acquire e2 were still not complete as of mid-October, 2001. Notwithstanding the incomplete status of e-Synergies' fund-raising activities, the e2 shareholders were asked to, and did, approve the Merger.

Further evidence that the Board members either knew, or should have known, that e-Synergies had not raised the necessary cash as of the Closing Date is the fact that e-Synergies did not transfer the entire $100,000 loan it was required to make to e2 under the Merger Agreement at one time. (D-233, p. 21, ¶ 5.5; D-234; D-241; D-246; D-247; D-248). Rather, e-Synergies funded that loan in increments. (Tr. 325/8-22; D-246; D-234). If e-Synergies had already raised millions of dollars of additional capital, why did it fund the e2 loan in such modest increments? The simplest answer is that e-Synergies would have fully funded its loan to e2 if it had already completed its fund-raising.

Moreover, just a few days before the Closing Date, the Board was considering a lending transaction with Yankee Capital Partners, LLC. (D-263; D-269). Again, why would e2 be considering a loan two days before the Merger's closing (particularly one as expensive as the Yankee Capital proposal), if e-Synergies already had the funds necessary to address e2's liquidity needs on hand? And, the simplest answer once again is that e2 would not need to borrow monies from Yankee Capital if e-Synergies had already completed its fund-raising.

For at least these reasons, and based upon the record as a whole, the Court finds that the Board (i) decided to close the Merger even though it knew that it had never received confirmation that e-Synergies had been able to raise new capital sufficient to satisfy e2's liquidity needs and debt,

(Tr. 1104/5-1105/15; Tr. 1735/7-9; D-254; D-266), and (ii) believed it was in e2's best interest, given e2's financial condition during the Engagement Period, to close a transaction for a business combination as soon as possible. (Tr. 335/25-336/10; Tr. 1082/13-19; D-154; D-175; D-232 at p. 2 (shareholder update in which they were told that "without consummating the proposed transaction, . . . there is no viable alternative for the survival of the Company"); D-268; D-273). Finally, the Court finds that as of the Closing Date, the Merger was the only viable alternative for e2's survival. (Tr. 480/5-16; Tr. 649/11-15; Tr. 787/6-19; Tr. 1189/10-16; Tr. 1514/3-1515/17; D-143; D-206; D-232, p. 2).

For all of these reasons, the Court concludes that Stephens did not breach the Contract.[20] Because the Court has concluded that Stephens did not breach the Contract, the Court need not address the issue of damages to e2.

### B.     Plaintiffs' Breach of Fiduciary Duty Claim

The Plaintiffs contend that Stephens breached fiduciary duties it owed to e2. For the following reasons, the Court disagrees.

Under Texas law, in order to recover for a breach of fiduciary duty, e2 must establish that: (i) Stephens owed a fiduciary duty to e2; (ii) Stephens breached the fiduciary duty it owed to e2; and, (iii) e2 suffered damages as a result of Stephens' breach. *Hartford Cas. Ins. v. Walker County Agency, Inc.*, 808 S.W.2d 681, 687 (Tex. App.–Corpus Christi 1991, no writ); *Jones v. Blume*, 196 S.W.3d 440, 447 (Tex. App.–Dallas 2006, pet. filed) (citing *Punts v. Wilson,* 137 S.W.3d 889, 891 (Tex. App.—Texarkana 2004, no pet.)). Thus, the Court's analysis begins with the issue of whether

---

[20]Any theory of contract breach not specifically addressed above is rejected as well. Based upon the record as a whole, the Court is satisfied that Stephens exercised reasonable and appropriate care, skill and competence in the performance of its duties under the Contract.

Stephens owed a fiduciary duty to e2. Here, the Plaintiffs contend that Stephens' fiduciary duties arise out of four types of relationships that have given rise to fiduciary duties under Texas law: (i) an agency relationship, (ii) a broker-client relationship, (iii) a financial advisor relationship, and/or (iv) an informal fiduciary duty relationship. Each relationship will be addressed in turn.

### 1. The Alleged Agency Relationship

An agency relationship is a special kind of relationship that gives rise to a fiduciary duty. *Johnson v. Brewer & Pritchard P.C.*, 73 S.W.3d 193, 200 (Tex. 2002) (citing *Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 160 S.W.2d 509, 513 (Tex. 1942)). Given the gravity of the duties that accompany a fiduciary relationship, Texas courts are unwilling to presume an agency relationship exists. *Johnson v. Johnson*, 629 S.W.2d 873, 875 (Tex. App.–Forth Worth 1982, writ ref'd n.r.e.) (*citing Buchoz v. Klein*, 184 S.W.2d 271, 286 (Tex. 1944) (citing 2 Tex. Jur. § 103)); *Sw. Wheel & Mfg. v. Sholts*, 501 S.W.2d 387, 393 (Tex. Civ. App.–Beaumont 1973, writ ref'd n.r.e.)). Therefore, in order for a court to find that an agency relationship exists, the evidence must unequivocally establish that the agent "is authorized by [the principal] to transact business or manage some affair for [the principal]." *See Jorgensen v. Stuart Place Water Supply Corp.*, 676 S.W.2d 191, 194 (Tex. Civ. App.–Corpus Christi 1984, no writ) (citing *Tamburine v. Ctr. Sav. Ass'n*, 583 S.W.2d 942, 948 (Tex. Civ. App.–Tyler 1979, writ ref'd n.r.e.). Consequently, the evidence must establish that the agent contracted to act on behalf of the principal and subject to the principal's control. *See Royal Mortgage Corp. v. Montague*, 41 S.W.3d 721, 733 (Tex. App.–Fort Worth 2001, no pet.) (citing *Robles v. Consol. Graphics, Inc.*, 965 S.W.2d 552, 558 (Tex. App.–Houston [14th Dist.] 1977, writ denied)); *see also* Restatement (Second) of Agency § 14N cmt. a (1958).

Texas courts focus on "the agreement between the parties, their words, and their conduct"

in order to determine whether the agent contracted to act on behalf of the principal and whether the agent is subject to the principal's control. *Id.* (citations omitted). When a contract is in place, unless there is "extrinsic evidence indicating that the contract was subterfuge or that the [principal] exercised control in a manner inconsistent with the contractual provisions," the contract is determinative of whether a fiduciary relationship exists. *Ross v. Tex. One P'ship*, 796 S.W.2d 206, 210 (Tex. App.–Dallas 1990, pet. denied, 806 S.W.2d 222 (Tex. 1991)) (citing *Newspapers, Inc. v. Love*, 380 S.W.2d 582, 590-92 (Tex. 1964)). In other words, if the contract does not indicate that the principal has the right to control the methods and details by which the agent accomplishes his tasks, and there is also no evidence of subterfuge or control in a manner inconsistent with the contractual provisions, then there is no fiduciary relationship between the parties. *Id.*; *see also Johnson*, 629 S.W.2d at 876 (citing *New Terminal Warehouse Corp. v. Wilson*, 589 S.W.2d 465, 468 (Tex. Civ. App.–Houston [14th Dist.] 1979, writ ref'd n.r.e.)).

Applying these principles here, Stephens did not agree to act on behalf of e2. In fact, the Contract expressly states that "Stephens is not authorized to make any agreement or commitment on behalf of [e2]," limiting Stephens' role to "assist[ing e2]…in exploring strategic alternatives." (P-66, p. 1). Moreover, there is no evidence indicating that the Contract was a subterfuge or that e2 exercised control in a manner inconsistent with the contractual provisions. *See Ross*, 796 S.W.2d. at 210. Accordingly, the Court concludes that there was no fiduciary relationship based on an agency relationship between Stephens and e2.

### 2. The Alleged Broker-Client Relationship

A broker-client relationship is typically construed as an agency relationship. *See Toal v. McNeely*, Docket No. 01-00-01416-CV, 2001 Tex. App. LEXIS 7525, at *11 (Tex. App.–Houston [1st

Dist.] Nov. 8, 2001, no pet. h.) (citing *Rauscher Pierce Refsnes, Inc. v. Great Sw. Sav. F.A.*, 923 S.W.2d 112, 115 (Tex. App.–Houston [14th Dist.] 1996, no writ)). A broker is one that is engaged on a commission basis to negotiate contracts on behalf of the client, "relating to property with the custody of which [the broker] has no concern." *L.B. Menefee Lumber Co. v. Davis-Johnson Lumber Co.*, 13 S.W.2d 962, 963-64 (Tex. Ct. App. 1929, no writ) (citations omitted); *see also Hand v. Dean Witter Reynolds Inc.*, 889 S.W.2d 483, 492-93 (Tex. App.–Houston [14th Dist.] 1994, writ denied). This relationship can arise contractually, where the contract places the broker in a position to negotiate bargains or contracts on behalf of the client, or when the principal exercises control over the broker in a manner consistent with an agency relationship. *Robles*, 965 S.W.2d at 557-58 (citing *FDIC v. Golden Imports,* 859 S.W.2d 635, 643 (Tex. App.–Houston [1st Dist.] 1993, no writ)) (finding circumstantial evidence of a fiduciary relationship when a broker negotiated on its client's behalf even though the principal reserved the right to negotiate contracts and there was "no authority to bind" the principal); *see also West v. Touchstone*, 620 S.W.2d 687 (Tex. Civ. App.–Dallas 1981, writ ref'd n.r.e.).

While Stephens' fee was contingent upon Stephens' issuance of a fairness opinion and the closing of a successful merger, the remaining evidence does not support a finding of a broker-client relationship between Stephens and e2. As previously noted, the Contract expressly provided that Stephens could not make an agreement on e2's behalf, (P-66, p. 1), and the evidence fails to establish that e2 exercised control over Stephens in a manner consistent with an agency relationship. (Tr. 1214/16-25; Tr. 1215/14-1216/14; Tr. 1224/19-22; Tr. 1294/10-14; D-101; D-124; PTO, p. 13, ¶ 21; P-66). Therefore, the Court concludes that there was no fiduciary duty based upon a broker-client relationship between Stephens and e2.

### 3.    The Alleged Financial Advisor Relationship

Under Texas law, a fiduciary relationship arises out of the financial advisor-client relationship when the financial advisor is "under a duty to act for or give advice for the benefit of another upon matters within the scope of their relation." *ARA Auto. Group v. Cent. Garage, Inc.*, 124 F.3d 720, 723 (5th Cir. 1997) (citing *Texas Bank & Trust Co. v. Moore*, 595 S.W.2d 502, 507 (Tex. 1980)). However, the Texas cases discussing financial advisor-client relationships focus on the traditional securities broker-client relationship, in which the client places an order with the broker to buy a security and the broker then executes the order on the client's behalf, which is a different kind of relationship than that enjoyed by e2 with Stephens. *See Hand v. Dean Witter Reynolds Inc.*, 889 S.W.2d 483, 492-93 (Tex. App.–Houston [14th Dist.] 1994, writ denied).

In support of their position, the Plaintiffs also rely heavily on two cases out of the Southern District of New York that address the fiduciary duties owed by an investment bank to a client when the investment bank agrees to act as the client's financial advisor during a corporate merger. *See Am. Tissue, Inc. v. Donaldson, Lufkin & Jenrette Securities Corp.*, 351 F. Supp. 2d 79, 102 (S.D.N.Y. 2004); *In re SMTK Expedite, Inc.*, Docket No. 01-50042, 2002 U.S. Dist. Lexis 3747, at *26-27 (S.D.N.Y. March 6, 2002). A careful review of the facts of those cases reveals certain distinguishing characteristics, however, that make them inapposite here.

In *American Tissue, Inc.*, the investment bank's financial advising duties included proposing a new corporate structure; providing refinancing, directly and indirectly through a related entity; and approving changes in its clients' management. 351 F. Supp. 2d at 83-85. The district court found that the investment bank owed a fiduciary duty to its client due to the "penetration of [its client] finances and management" as well as its clients' reliance on the investment bank to perform due

diligence. *Id.* at 102.

Similarly, in *SMTK Expedite, Inc.*, the investment bank's financial advisory duties included providing refinancing, indirectly through a related entity, as well as participating in the merger process by valuing the acquired entity, advising on a purchase price, and structuring the merger transaction. 2002 U.S. Dist. Lexis 3747 at *26-27. The investment bank was also an investor in the acquired entity, and stood to gain significantly from a merger between the acquired entity and the investment bank's client. *Id.* at *8-11. Based upon these facts, the district court concluded that the plaintiff had stated a breach of fiduciary claim. *Id.* at *26-27.

The facts here are different from the facts present in the New York financial advisor cases. The extent of Stephens' involvement in the Merger was significantly less than the involvement of the investment banking firms in the New York cases. In short, Stephens did not penetrate e2's finances and management.

For all of these reasons, the Court concludes that the financial advisor-client relationship between Stephens and e2 did not give rise to a fiduciary relationship**.**

### 4. The Alleged Informal Fiduciary Relationship

Texas courts have occasionally found that a fiduciary relationship exists despite the lack of a formal fiduciary relationship between the parties. *Thigpen v. Locke*, 363 S.W.2d 247, 253 (Tex. 1962). This informal fiduciary relationship is disfavored because "it imposes extraordinary duties and requires the fiduciary to put the interests of the beneficiary ahead of its own if the need arises." *ARA*, 124 F.3d at 723 (citing *Floors Unlimited, Inc. v. Fieldcrest Cannon, Inc.*, 55 F.3d 181, 188 (5th Cir. 1995)). Therefore, "mere subjective trust alone is not enough to transform arms-length dealing into a fiduciary relationship" because "businessmen generally do trust one another, and their dealings

are frequently characterized by cordiality." *Thigpen*, 363 S.W.2d at 253. Additionally, Texas courts will not create an informal fiduciary relationship simply because the parties' interests were "aligned" at some point in time. *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 177 (Tex. 1997). Ultimately, a specific reason must exist for the principal to place a high degree of trust in the alleged agent. *Transp. Ins. Co. v. Faircloth*, 898 S.W.2d 269, 280 (Tex. 1995).

While Stephens and e2 enjoyed a confidential relationship, the evidence fails to support the requisite high degree of trust. The evidence indicates that e2 and Stephens trusted one another as "businessmen generally do." *See* (P-73) (serving as an example of the typical confidential information e2 gave to Stephens); (P-4) (exemplifying Stephen's acknowledgement of the need to exercise care when handling confidential client information); *Thigpen*, 363 S.W.2d at 253. The evidence also indicates that Stephen's and e2's interests were aligned at one point in time because Stephens would not receive its fee under the Contract unless e2 consummated a merger. (P-66). However, the credible evidence does not reveal a specific reason for e2 to place a high degree of trust in Stephens, transforming the transaction beyond an arms-length deal. (Tr. 142/8-143/25); *Faircloth*, S.W.2d at 280; *Thigpen*, 363 S.W.2d at 253. Therefore, the Court concludes that there was no fiduciary duty based upon an informal fiduciary relationship between Stephens and e2.

In short, after considering the record as a whole, the Plaintiffs failed to establish the existence of a fiduciary relationship between Stephens and e2, from which a fiduciary duty could arise. And, because there was no fiduciary duty, there could be no breach. Accordingly, the Court concludes that the Plaintiffs may not recover from Stephens for breach of a fiduciary duty.

However, even assuming that the Court's prior conclusions are erroneous – *i.e.*, that there was a fiduciary relationship between e2 and Stephens that could be breached, and assuming further

that the Plaintiffs proved some breach of duty,[21] the Plaintiffs have failed to prove that Stephens'

breach of duty[22] injured e2 or benefitted Stephens.[23] In Texas, a plaintiff in a breach of fiduciary duty

case must prove causation in order to recover damages. *Liberty Mut. Ins. Co. v. Gardere & Wynne,*

*LLP*, No. 02-11176, 2003 WL 22709008, at *2 (5th Cir. Nov. 18, 2003) (unpublished decision);

*Abetter Trucking Co. v. Arizpe*, 113 S.W.3d 503, 508 (Tex. App.–Houston [1st Dist.] 2003). The

plaintiff must show that the breach resulted in injury to the plaintiff or benefit to the defendant. *Cote*

*v. Bank One Texas, N.A.*, No. 4:03-CV-296-A, 2004 WL 594114 at *3 (N.D. Tex. March 16, 2004,

no pet. h.). Or, stated another way, there must be proximate causation between the breach and the

injury. *Procom Serv., Inc. v. Deal*, No. 302CV0600BF, 2003 WL 298752, at *3 (N.D. Tex. Feb. 10,

2003, no pet. h.). As the Texas Supreme Court held in *IHS Cedars Treatment Ctr. of Desoto, Texas,*

*Inc. v. Mason*, 143 S.W.3d 794, 798-99 (Tex. 2004):

> The two elements of proximate cause are cause in fact (or substantial factor) and
> foreseeability. *Id.; Travis v. City of Mesquite,* 830 S.W.2d 94, 98 (Tex.1992). These

---

[21]The alleged acts that purportedly give rise to a breach of fiduciary duty claim against Stephens are essentially the same acts that are alleged to constitute a breach of contract – *i.e.*, Stephens failed to properly advise the Board on the status of e-Synergies' fund-raising activities and/or Stephens failed to withhold its fairness opinion so that the Merger could not close. The Court rejected these acts as breaches of the Contract because the Court concluded that Stephens performed its obligations under the Contract with that care required by Texas law. Similarly, the Court would reject these acts as breaches of a fiduciary duty because the Court believes that Stephens put e2's interests ahead of its own and acted in "good faith, fair dealing, honest performance, and strict accountability." *Imperial Premium Fin., Inc. v. Khoury*, 129 F.3d 347, 353 (5th Cir. 1997) (citing *ARA*, 124 F.3d at 723) (applying Texas law); *Ludlow v. Deberry*, 959 S.W.2d 265 (Tex. App.–Houston [14th Dist.] 1997, no writ).

[22]As just noted, the Plaintiffs contend that Stephens breached its fiduciary duty to e2 by putting "its own interests ahead of the interests of e2 by failing to report e-Synergies' lack of financial wherewithal to e2's directors and by allowing its fairness opinion to be released after cutting a side-deal with e-Synergies which excluded e2's other creditors." (Plaintiffs' Revised Findings, at pp. 54-55, ¶ FD 3(B)). Of course, the Court has already found that Stephens adequately reported e-Synergies' lack of financial wherewithal to the Board. (*See supra* at pp. 21-27). Moreover, there was no side-deal. e2 asked Stephens to see if e-Synergies would be willing to pay Stephens' fee when e2's cash position was such that it was unable to pay the fee. Stephens did so, and e-Synergies agreed to pay the fee through the issuance of a note. Once the note was issued and Stephens' fee was paid, Stephens was contractually bound to issue its fairness opinion.

[23]In their Revised Findings, the Plaintiffs improperly attempt to reverse the burden of proof. (Plaintiffs Revised Findings, at p. 55, ¶ FD 4). The Court rejects these contentions; the burden of proof remains on the Plaintiffs under Texas law.

elements cannot be satisfied by mere conjecture, guess, or speculation. *Doe v. Boys Clubs of Greater Dallas, Inc.,* 907 S.W.2d 472, 477 (Tex.1995). Cause in fact is established when the act or omission was a substantial factor in bringing about the injuries, and without it, the harm would not have occurred. *Id.; Union Pump Co. v. Allbritton,* 898 S.W.2d 773, 775 (Tex.1995); *Travis,* 830 S.W.2d at 98. In *Lear Siegler, Inc. v. Perez,* we found the Restatement (Second) of Torts to be instructive on this point: In order to be [the proximate cause] of another's harm, it is not enough that the harm would not have occurred had the actor not been negligent.... [T]his is necessary, but it is not of itself sufficient. The negligence must also be a substantial factor in bringing about the plaintiff's harm. 819 S.W.2d 470, 472 (Tex.1991) (quoting Restatement (Second) of Torts § 431 cmt. a (1965)). Accordingly, cause in fact is not established where the defendant's negligence does no more than furnish a condition which makes the injuries possible. *Boys Clubs,* 907 S.W.2d at 477 (citing *Bell v. Campbell,* 434 S.W.2d 117, 120 (Tex.1968)). In other words, the conduct of the defendant may be too attenuated from the resulting injuries to the plaintiff to be a substantial factor in bringing about the harm. *Boys Clubs,* 907 S.W.2d at 477; *Union Pump,* 898 S.W.2d at 776; *Lear Siegler,* 819 S.W.2d at 472.

As the *IHS Treatment Center* court further observed, "[o]ur precedents establish that merely creating the condition that makes harm possible falls short as a matter of law of satisfying the substantial factor test." *Id.* at 800. Cause in fact means that the defendant's act or omission was a substantial factor in bringing about an injury that would not otherwise have occurred. *Union Pump*, 898 S.W.2d at 775 (citations omitted).

Here, even assuming that Stephens breached fiduciary duties it owed to e2, there is no credible evidence from which the Court can reasonably infer that Stephens' alleged acts and/or omissions "were a substantial factor in bringing about the injuries" e2 allegedly suffered, and that without those acts or omissions, "the harm would not have occurred." *IHS Cedars*, 143 S.W.3d at 799 (citations omitted). As relevant here, the Plaintiffs contend that if Stephens had (i) informed the outside directors that e-Synergies did not have the financial wherewithal that e2 needed from a

merger, or (ii) kept the Merger from closing by refusing to issue the fairness opinion,[24] the outside

directors would have invested the necessary funds to keep e2 operating successfully. The Plaintiffs

further contend that Bray/Monarch Partners alone had $6 to $7 million immediately available to

deploy for investments and could have invested at least $2 million in e2 on November 15, 2001 if it

chose to do so. According to the Plaintiffs, "Bray chose not to do so because 'there was no reason

to because we thought the e-Synergies deal was going to get done because they had the money.'"

(Plaintiffs' Revised Findings, at p. 40, ¶ 6B(2)). Finally, the Plaintiffs contend that "[t]he investment

of those monies on November 15, 2001 would have addressed the cash-flow needs e2 was looking

[24]The Court is puzzled by this argument, and a corollary argument the Plaintiffs make. First, the Plaintiffs argue that Stephens breached the Contract by releasing its fairness opinion from escrow. (Plaintiffs' Revised Findings, at pp. 36-37). While the Court struggles to understand this argument, the Plaintiffs apparently contend that the release of the fairness opinion from escrow, rather than reporting that e-Synergies did not have the needed cash, "effectively abrogated to Stephens the Board's power to be the ultimate decision-maker with respect to the risks being assumed if the merger went forward." (*Id*. at p. 36). The Court rejects this argument because it has concluded that the Board understood the status of e-Synergies' fund-raising efforts as of the Closing Date. (*See supra* at pp. 18-27). Moreover, the Court concludes that Stephens was contractually obligated to issue a fairness opinion if asked to do so, as it was here. (P-66). While the Plaintiffs are correct that a failure by Stephens to issue a fairness opinion would have precluded the Merger from closing (because the issuance of the fairness opinion was a condition to closing), Stephens had no right to refuse to issue the opinion once e-Synergies agreed to pay Stephens' fee through the issuance of the promissory note. And, as at least one of the outside directors (Bonner) admitted, the Board wanted Stephens to "allow its fairness opinion to be used in those closing documents." (Tr. 393/5-12). Finally, Stephens had no right to substitute its judgment regarding the viability of the Merger for the Board's judgment. (P-66, p. 1). It was the Board's decision to make to proceed to close the Merger or to allow the closing deadline to simply pass. The Board made that decision and allowed the Merger to close and become effective.

The Board clearly knew that e-Synergies had not actually raised the funds when it approved the Merger on October 10, 2001, because that is what it authorized management to tell e2's shareholders. And, as noted previously, Browne told Bonner that e-Synergies did not have the needed funds as of November 2, 2001. What the Court would have expected is for the Board to have requested a final update call with Browne, its transaction leader, and Stephens, its exclusive financial advisor, just before the date by which the Merger must have closed or e-Synergies could walk away from the deal – *i.e.*, November 15, 2001. However, as Bonner admitted, no final meeting of the Board was held. (*See supra* at n.19). Instead, the Board simply allowed the Merger to proceed without a final update on any issue that was relevant to their decision to proceed to close the Merger.

As it relates to the breach of fiduciary duty claim, the Plaintiffs argue that Stephens breached a fiduciary duty to e2 by "allowing its fairness opinion to be released after cutting a side-deal with e-Synergies which excluded e2's other creditors." (Plaintiffs' Revised Findings, at p. 55, ¶ FD3(B)). The Court disagrees for several reasons. First, when e2 did not have the cash to pay Stephens' fee under the Contract, it asked Stephens to discuss payment of the fee with e-Synergies. (Tr. 1737/16-20; Tr. 1259/15-1260/11). Because e2 asked Stephens to look to e-Synergies for payment of its fee, Stephens had every reason to believe that e2 wanted Stephens' fee to be paid by e-Synergies. In short, there was no "side-deal" of which e2 was unaware. Second, as a matter of law, Stephens owed no duties to e2's unsecured creditors. *See In re Clark Pipe & Supply Co., Inc.*, 893 F.2d 693, 702 (5th Cir. 1990) (citing *In re W.T. Grant Co.*, 699 F.2d 599, 609 (2nd Cir. 1983)). Stephens was entitled to attempt to protect itself regarding the payment of its fee.

to address through a merger with e-Synergies and would have resulted in the on-going operation of [e2]." (*Id*.).

For the reasons explained more fully below, the Court rejects the factual predicate for these legal contentions. First, this testimony of Bonner, Bray, and/or Browne is not credible. In short, based upon the entirety of the record, the Court concludes that the cited testimony is little more than an after-the-fact re-write of what really happened in October/November 2001 with the benefit of 20/20 hindsight. If the outside directors and Browne were truly interested in a further equity investment in order to retain for themselves (and the other e2 shareholders) the full upside potential in e2, as opposed to sharing that upside with e-Synergies and its other shareholders through the Merger, why didn't the outside directors and Browne tell Stephens of their willingness to make a further equity investment once they settled with Farris and Cordes on or about October 8, 2001? In fact, Stephens was never told that the outside directors and Browne were willing to consider a further equity investment in e2 once they settled with Farris and Cordes.[25]

Second, on Tuesday, October 2, 2001, Browne sent an email to e2's corporate counsel advising that "[s]ubject to Jeff Farris and Jeff Cordes signing their respective [settlement] agreements on Wednesday, the board is prepared to sign the [e-Synergies definitive agreement] on Thursday morning." (D-205). If the outside directors were contemplating a further equity investment in e2 once Farris had agreed to step aside, as they now contend, why would the Board be prepared to sign

---

[25]In its status memorandum to e2 dated September 3, 2001, Stephens recommended that "the Board should authorize the Company to pursue the options currently available to e2," "[u]nless the management and the Board of Directors of e2 can access new equity capital for the Company immediately." (D-124, p. 4). A Board meeting occurred on September 4, 2001, at which Stephens was present. At that meeting, McAndrews advised that Avenue A had no intention of making "any further investments in e2." That position was reiterated in writing on September 7, 2001, when Jeff Miller, in-house counsel for Avenue A, sent an email to all of the Board members and Browne. (D-143). There is no credible evidence to suggest that Stephens was ever advised to the contrary.

**Memorandum Opinion and Order** **Page 38**

a definitive merger agreement with e-Synergies the morning after the alleged impediment to further internal fund-raising was removed? Of course, the simplest answer is that the Board would not have moved forward immediately with signing the definitive merger agreement if there was a viable internal fund-raising campaign in prospect.

Third, it is not clear that Farris would have agreed to settle and step aside as CEO of e2 other than in the context of the Merger. While it is true that e2 settled with Farris and mutual releases were signed prior to the Closing Date, as Browne "clarified" at the October 10, 2001 Board meeting, "the Farris Contribution and Release Agreement does not provide for Mr. Farris' termination but provides that the Company will arrange for his termination." (D-224, p. 1). As the Board minutes go on to reflect, "Mr. Farris would resign immediately following the closing date of the e-Synergies merger." (*Id*.) And, in fact, Farris remained employed by e2 until the Closing Date. (Tr. 1759/1-3 (indicating that Farris no longer had a job after the Merger closed)).

Fourth, if the outside directors and Browne had truly been willing to invest further monies in e2 in the October/November 2001 time frame, and they believed e2 could succeed on a stand-alone basis with the funds they were willing to provide, why didn't they instruct Stephens to stop pursuing the Merger and/or why didn't they ask Stephens detailed questions about the status of e-Synergies' fund-raising efforts on or before the Closing Date? In short, if sophisticated businessmen, as the outside directors were, believed that they had a viable internal solution to e2's financial problems, why weren't they aggressively pursuing that alternative instead of the Merger, in order to retain all of the upside potential in e2 for themselves and the other e2 shareholders?

While the Plaintiffs' counsel acknowledges that these are the appropriate "hard questions," he argues that the outside directors were lulled into believing that e-Synergies had raised the needed

capital to fund e2's ongoing operations, and therefore there was no need to pursue the internal funding solution. This argument makes no sense, however. If significant equity holders of e2 thought e2 was a viable venture and could succeed through an internal fund-raising campaign, as Bonner, Bray and Browne testified, why would they ever agree to share that upside potential with e-Synergies? The simplest answer is that they would not.

Finally, let us look at what the e2 shareholders were told about the e-commerce market conditions, the strategic rationale for the Merger, and why they should vote in favor of the Merger, in assessing what the Board knew about the Merger and e-Synergies' fund-raising activities. Specifically, in a communication titled "Time Sensitive Shareholder Information," e2 shareholders were told that a "package of critical and time sensitive information regarding your investment in e2 Communications" would be coming by "Federal Express, US Airmail or by hand delivery on Friday October 12, 2001." (D-232, p. 1). In this document, e2 shareholders were further told that:

> 1. The current financial position of e2 Communications will not allow it to continue without additional infusion of capital resources to support continued operations and past due obligations.
> 2. Given the Company's current financial condition, without consummating the proposed transaction, management believes there is no viable alternative for the survival of the Company.
> 3. The Merger – the Board of Directors of e2 Communications has determined that the Merger and the Merger Agreement with e-Synergies . . . is in the best interest of the Company and its shareholders. The Board of Directors has unanimously voted in favor of the Merger and the Merger Agreement and recommends that you consent to the Merger and the Merger Agreement by signing the Shareholder Merger Consent and completing and signing the Accredited Investor Questionnaire and returning them to our attention as soon as possible.

(D-232, p. 2).

The further shareholder communication (scheduled to be received by shareholders on October 12, 2001), advised the e2 shareholders that

the 2nd quarter [2001] was extremely difficult for anyone associated with technology or the Internet. Most of us witnessed the continuing demise of businesses in this space. . . . [T]he uncertainty over the Internet and the economy in general resulted in a significant slow down with both current and potential e2 customers. We saw projects cancelled, slowed, delayed, and across the board, downsized. To add to this, the unstable economic picture and numerous business failures created a requirement from many buyers, that suppliers like e2 have significant financial resources at their disposal. . . .

From a working capital perspective, the decline in billings despite cost reductions has made our cash position very difficult. Cash resources available at the end of the 1st quarter are gone and had it not been for the assistance of loans and the cooperation of many of our employees and vendors, the Company would not have been able to continue operations. . . .

What became clear through the process [of working with Stephens in identifying strategic alternatives] was that raising capital in the current environment would be very difficult. . . . Given the substantial cash reserves of several of our competitors, we could easily be out spent for new technology leaving us in an unfavorable competitive position. . . . Even with significant growth and capital, we stood to be only a distant 3rd or 4th in our space. . . . There was a growing movement to consolidate companies to offer greater baskets of services to customers. . . . Consolidators were taking advantage of the market environment and purchasing companies at cash values or less. . . . Based upon this input, Stephens began focusing on seeking out a strategic acquirer for the Company. They sought out and talked with nearly 30 companies who were considered to be likely acquirers. Of the offers presented, e-Synergies, a new company focused on consolidating portions of the web services and CRM space, became the compelling choice. . . .

e2 was looking for several criteria from an acquirer, that would enable the Company to survive the downturn in the market and enable future growth and profitability. Included in this list of characteristics were:
      1) Access to new markets,
      2) Access to new capital,
      3) Additional skills and technologies, and
      4) The ability to leverage sales channels and customers.
      The Company believes that it has found all these strengths in the proposed merger with e-Synergies.

(D-222, pp. 1-3).

Of significance here, regarding e-Synergies' ability to access new capital, the e2 shareholders

were told that

e-Synergies is working with groups in the U.S., Europe and Asia to adequately fund the combined companies and enable them to continue growth by acquisition. They

have raised more than $9 million in debt and equity to date. They raised over $3 million dollars in the past quarter to acquire Xceed, a web services firm out of bankruptcy and are *finishing their fundraising for their other planned acquisitions, including that of e2*.

(D-222, p. 3 (emphasis added)). Finally, management "encouraged" all e2 shareholders "to vote in favor of the transaction," (D-222, p. 4), stating that: [i]t is our expectation that the combination of these companies with the help of a recovering market will provide our shareholders with an excellent opportunity for long-term growth and returns." (*Id.*).

When the shareholder communications are thoroughly reviewed, it is clear that management and the Board knew that e2 was in dire financial circumstances – *i.e.*, it had no cash, raising the needed cash would be "very difficult," the market in which e2 operated was in severe distress itself, certain of e2's competitors were in better financial condition than e2, and e2 needed broader access to new markets, capital skills and technologies, and leveraged sales channels and customers to succeed. In short, e2 shareholders were told that a stand-alone e2 could no longer succeed – *i.e.*, "there is no viable alternative for the survival of the Company" than the Merger.

After carefully reviewing the record as a whole, the Court agrees with the conclusions articulated in the shareholder communications. There was no viable business alternative available to e2. An internal fund-raising campaign would have been too little, too late – *i.e.*, it would not have addressed all of e2's needs, as articulated in the e2 shareholder communications.

For these reasons, the Court concludes that the Plaintiffs' arguments, supported by the trial testimony of the outside directors and Browne, are little more than after-the-fact rationalizations by sophisticated Board members who knowingly entered into a potentially risky merger with a new start-up company (e-Synergies) that had embarked upon a strategy of rolling up other troubled e-commerce companies under its umbrella, (Tr. 1729/25 -1730/3 ("we were clear that e-Synergies was

a – basically, a shell corporation whose mission was to acquire companies in distress or out of bankruptcy and to try to put those companies together as a going concern.")), because it was the best alternative available to them on the Closing Date. When the Merger failed, the outside directors started looking for someone else to blame for what turned out to be, with the benefit of hindsight, an unfortunate decision on the part of the Board, initially, and the e2 shareholders, ultimately.

Nor did Stephens benefit from any alleged breach of fiduciary duty. The only possible benefit to Stephens from e2 proceeding with the Merger was the payment of its fee, which was a condition to closing. However, neither e2 nor e-Synergies had the financial ability to pay the fee at closing, and Stephens agreed to accept a promissory note from e-Synergies in satisfaction of that fee. (*See infra* at pp. 43-44). Because e-Synergies never successfully completed its Asian fund-raising, the note was not paid. So, in fact, Stephens received no benefit from its alleged breaches of fiduciary duty.

Accordingly, the Court concludes that the Plaintiffs have failed to prove that Stephens' alleged breaches of fiduciary duty were the cause of damages to e2 or a benefit to Stephens. And, for any of these reasons, the Plaintiffs' breach of fiduciary duty claim fails. Because the Court has concluded that the Plaintiffs' breach of fiduciary duty claim fails, the Court need not address the issue of damages to e2.

### C. Plaintiffs' Claim Objection

Stephens seeks payment of $457,347.05 for fees and expenses it claims under the Contract.[26] (Tr. 1547/17–23). The Plaintiffs contend that the Stephens Claim is barred due to an accord and satisfaction and/or the payment of the Stephens Claim through Stephens' acceptance of a

---

[26]As noted previously, Stephens amended the amount of the Stephens Claim at trial.

promissory note from e-Synergies.[27] (PTO, p. 3, ¶7). For the reasons explained more fully below, the Court finds against Stephens and in favor of the Plaintiffs on these issues.

Turning first to accord and satisfaction, in *Wallace v. Larson*, 199 S.W.2d 198, 201 (Tex. Civ. App.–Waco 1946, writ ref'd n.r.e.), the court stated:

> Accord and satisfaction is a well recognized legal method of discharging any kind of a contract or cause of action, 'whereby the parties agree to give and accept something in settlement of the claim or demand of the one against the other, and perform such agreement, the 'accord' being the agreement, and the 'satisfaction' [being] its execution or performance. . . . Although the term or phrase 'accord and satisfaction' contemplates a completed transaction, it is well settled in Texas and in other jurisdictions that a promise to perform the agreement of accord, rather than actual performance thereof, may in and of itself constitute the satisfaction, provided there is an express agreement to this effect or if such is clearly the intention of the parties. (Citations omitted).

Accordingly, the question raised by Stephen's receipt of the promissory note from e-Synergies (the "Note") is whether the Note was "merely [an] additional promise to pay that did not discharge the underlying obligation . . . ." *Woods-Tucker Leasing Corp. v. Kellum*, 641 F.2d 210, 215 (5th Cir. 1981). Here, Ciuba's more credible testimony established that Stephens intended to accept the Note in satisfaction of e2's obligation to pay Stephens' fee under the Contract, and the Note was not merely an additional promise. While Ciuba attempted to testify differently at trial, he clearly testified in his deposition, which was used to impeach him at trial, (i) that it would be fair to say that "one of the conditions of the transaction was that e-Synergies would be responsible to pay Stephens' fee, and e2 would not be," (Tr. 1262/20-25), and (ii) when asked if Stephens accepted the Note in satisfaction of e2's obligation, he testified "that was the – the plan." (Tr. 1264/13-16).

The Court finds Ciuba's deposition testimony more credible than his trial testimony in this

---

[27]The promissory note is dated November 15, 2001, and is signed by Tom Ronk, e-Synergies' President. (D-277).

regard. Accordingly, the Court finds that Stephens accepted the Note in satisfaction of e2's obligation under the Contract to pay Stephens' fees and expenses. Accordingly, the Stephens Claim will be disallowed.

### D. Plaintiffs' Request for Equitable Subordination of the Stephens Claim

In the alternative, the Plaintiffs contend that if the Court allows the Stephens Claim, then the Court should equitably subordinate it to all other allowed unsecured claims in the Bankruptcy Case.[28] (PTO, p. 4, ¶ 9). According to the Fifth Circuit, a creditor's claim should be equitably subordinated to other claims under § 510(c) of the Bankruptcy Code when:

(1)     The claimant has engaged in some type of inequitable conduct. This occurs when either: (a) a fiduciary of the debtor misuses his position to the disadvantage of other creditors; or (b) when a third party controls the debtor to the disadvantage of other creditors; or (c) when a third party actually defrauds other creditors;

(2)     The claimant's inequitable conduct either resulted in injury to creditors or conferred an undue advantage on the claimant; and

(3)     Invocation of equitable subordination is not inconsistent with the provisions of the Bankruptcy Code.

*Fabricators, Inc. v. Technical Fabricators, Inc. (In re Fabricators, Inc.)*, 926 F.2d 1458, 1464-65 (5th Cir. 1991); *In re CTS Truss, Inc.*, 868 F.2d 146, 148-49 (5th Cir. 1989) (citations omitted).

Equitable subordination allows the Court to look beyond the form of a dispute or transaction to its substance and to rearrange the priority of claims based upon the conduct of the creditors. *See In re SubMicron Sys. Corp.*, 432 F.3d 448, 454 (3rd Cir. 2006); *In re Enron Corp.*, 333 B.R. 205, 233 (Bankr. S.D.N.Y. 2005) (subsequent history omitted)*; Pepper v. Litton*, 60 S.Ct. 238 (1939). A claim

---

[28]While the Court is not required to address this issue in light of its disallowance of the Stephens Claim, it will do so to facilitate appellate review of this decision.

should be equitably subordinated to the extent necessary to offset the harm that the debtor and its creditors suffered as a result of the inequitable conduct. *See In re Missionary Baptist Found. of Am.*, 818 F.2d 1135, 1143 (5th Cir. 1987) (citing *In re Mobile Steel Co.*, 563 F.2d 692, 701 (5th Cir. 1977).

After carefully considering the record as a whole, the Court finds that Stephens has not engaged in any type of inequitable conduct. For the reasons previously stated, Stephens was not a fiduciary of e2 who misused its position to the disadvantage of other e2 creditors. (*See supra* at pp. 28-43). Nor did Stephens control e2 to the disadvantage of other e2 creditors. During the Engagement Period, the Board remained the ultimate decision maker with respect to the Merger or any other "strategic alternative." Stephens simply provided information and advice to the Board. The Board remained responsible for making, and in fact made, the decision to proceed with the Merger. Finally, Stephens did not actually defraud other e2 creditors by accepting the Note. As previously found, e2 was experiencing severe cash flow shortages before and during the Engagement Period. Moreover, e2 was struggling to pay its creditors during the Engagement Period because of its own internal operating problems and because of the downturn in the e-commerce industry generally. (*See supra* at pp. 5-7). Stephens' efforts to assist e2 in identifying strategic alternatives/business combination partners were designed to help, not hurt, other e2 creditors, to whom Stephens owed no duty under the Contract or Texas law. Finally, if Stephens had not agreed to be paid through the issuance of the Note, a condition to the Merger – *i.e.*, payment of Stephens' fee under the Contract, would not have been satisfied, and the opportunity to obtain the funds needed for e2's survival would have been lost.

Because the Plaintiffs did not carry their burden of proof with respect to their claim for

equitable subordination, the claim must be denied.

### E. Stephens' Indemnification Claim

Stephens seeks recovery on a counterclaim for indemnification under the Contract. For the reasons explained more fully below, the Court concludes that Stephens is entitled to be indemnified for the reasonable attorneys' fees and expenses it has incurred in defending itself in the Adversary pursuant to the express terms of its indemnity agreement with e2. (P-66, Exhibit A, ¶ (b)).

### 1. The Plan's Rejection Claim Bar Date

Section 8.1 of the Plan provided that all executory contracts of e2 that were not specifically assumed were rejected as of the Confirmation Date. (P-280, § 8.1). And, section 8.2 of the Plan provided a bar date for asserting rejection claims – *i.e.*, rejection claims were required to be filed by thirty days after the "Effective Date." (*Id.*, § 8.2). Section 8.2 further provided that the rejection claim had to set forth "the damages alleged to arise from the rejection of the executory contract to which such person is a party." The "Effective Date" of the Plan was April 11, 2003.[29]

The flaw in the Plaintiffs' legal contention that Section 8.2 of the Plan bars Stephens' indemnity claim, however, is the fact that the Contract was not an executory contract on the Petition Date that was subject to the requirements of Section 8.2. An executory contract is a contract where "performance remains due to some extent on both sides." *In re Murexco Petroleum, Inc.*, 15 F.3d 60, 62-63 (5th Cir. 1994) (citing *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 522 n.6 (1984) (quoting H.R.Rep. No. 95-595, 95th Cong., 1st Sess. 347 (1977))). When applying this standard, the courts look to whether "at the time of the bankruptcy filing, the failure of either party to complete

---

[29]The "Effective Date" was defined in section 2.29 of the Plan to occur upon the happening of certain events and was to be no later than the first Business Day following sixty days after the Confirmation Date. (P-280, § 2.29). Those events occurred on April 11, 2003. *See* Notice Of Occurrence Of Confirmed Plan's Effective Date, filed April 11, 2003 (docket no. 274 in the Bankruptcy Case).

performance would constitute a material breach of the contract, thereby excusing the performance of the other party." *Id*.

Applying this test here, the Court concludes that the Contract was not an executory contract on the Petition Date because Stephens had fully performed its obligations under the Contract by that time – *i.e.*, no further performance remained due from Stephens under the Contract. Accordingly, the Contract was not rejected by e2 on the Confirmation Date and the bar date set forth in section 8.2 of the Plan is of no consequence here.

### 2. Stephens Alleged Breaches of the Contract

Turning next to the Plaintiffs' breach of contract argument, the Court rejects that argument as well. While the Plaintiffs are correct that "Texas law prohibits a party (especially a fiduciary) from enforcing a contract when that party has breached that agreement," (Plaintiffs Revised Findings, p. 61, ¶ IND3), the Plaintiffs' contention that Stephens' prior breaches of the Contract bars the indemnification claim fails because the Court has concluded that Stephens did not breach the Contract. (*See supra* at pp. 12-28).

### 3. Public Policy

Nor does public policy bar Stephens' indemnity claim. Pursuant to the Contract, e2 agreed "to indemnify and hold Stephens harmless in accordance with the indemnity rider attached as 'Exhibit A.'" (P-66, p. 3). Subsection (a) of Exhibit A states that e2 will "hold [Stephens] harmless:"

> from and against any and all losses, claims, damages, and liabilities, joint or several (collectively, "Damages"), related to or arising out of any matter referred to in the engagement letter to which this Exhibit is appended (the "Agreement"), including an Indemnified Person's services thereunder, except to the extent such Damages are finally, judicially determined to have resulted directly and primarily from the gross negligence or willful misconduct of an Indemnified Person.

Subsection (d) in turn states:

> The Company also agrees that no Indemnified Person shall have any liability to the Company for or in connection with the Agreement, except for liability for Damages which are finally, judicially determined to have resulted directly and primarily from the gross negligence or wilful misconduct of the Indemnified Person.

To be enforceable in Texas, an indemnification clause must give fair notice of conspicuousness. *Dresser Indus., Inc. v. Page Petroleum, Inc, et al.*, 853 S.W.2d 505, 507-11 (Tex. 1993) (applying the definition of conspicuousness found in the Uniform Commercial Code to indemnification clauses); *see* Tex. Bus. & Com. Code § 1.201(10). Determining whether a provision is "conspicuous" is a question of law. *Dresser Indus.*, 853 S.W.2d at 510. In making such a determination, Texas courts focus on factors that indicate that "a reasonable person against whom a clause is to operate ought to have noticed it." *Id.* at 511. Accordingly, Texas courts have found that the following factors render a clause conspicuous: contrasting type or color, headings printed in capital letters, clauses not hidden under a separate heading or surrounded by unrelated terms, clauses on the front of documents, and clauses contained in extremely short documents. *Id.* at 510-11.

For example, one Texas court found a clause typed on the front of a drilling contract to be conspicuous when it was entitled "Contractor's Indemnification of Operator" and the text of the heading was in bold, capitalized, and the clause was not buried among unrelated terms. *Ranger Ins. Co. v. Am. Int'l Specialty Lines Ins. Co.*, 78 S.W.3d 659, 665 (Tex. App.–Houston [1st Dist.] 2002, no pet.); *see also UPS Truck Leasing Inc., v. Leasway Transfer Pool, Inc.*, 27 S.W.3d 174, 175 (Tex. App.–San Antonio 2000, no pet.) (discussing the benefit of a stand-alone indemnification clause). In contrast, the Texas Supreme Court found that an indemnification clause located on the back side of a document among a series of numbered, untitled provisions was not conspicuous. *Dresser Indus.*, 853 S.W.2d at 511. Similarly, a clause hidden on the back of a document, located under an

unrelated title and surrounded by unrelated terms, was also found to be not conspicuous. *Id.* at 510

(citing *K & S oil Well Svc., Inc. v. Cabot Corp.*, 491 S.W.2d 733, 737 (Tex. Civ. App.–Corpus Christi

1973, writ ref'd n.r.e.)).

Here, the indemnification provisions contained on Exhibit A to the Contract give fair notice

of conspicuousness. *See id.* at 507. The Contract clearly references the indemnification clause, the

indemnification clause stands alone, the indemnification clause is not surrounded by unrelated terms,

and the indemnification clause's heading is capitalized. (P-66, Exhibit A). Accordingly, the Court

concludes that the indemnification provisions of the Contract are conspicuous and are not void as

a matter of public policy.

### 4.    Gross Negligence or Willful Misconduct

Next, the Plaintiffs contend that Stephens' gross negligence or willful misconduct bars its

indemnification claim. "Gross negligence" is defined in section 41.001(11) of the Texas Civil Practice

and Remedies Code to mean an act or omission:

> (A) which when viewed objectively from the standpoint of the actor at the time of its
> occurrence involves an extreme degree of risk, considering the probability and
> magnitude of the potential harm to others; and
>
> (B) of which the actor has actual, subjective awareness of the risk involved, but
> nevertheless proceeds with conscious indifference to the rights, safety, or welfare of
> others.[30]

Moreover, willful misconduct is intentional misconduct. *Baskin v. Mortgage & Trust, Inc.*, 837

S.W.2d 743, 746 (Tex. App.—Houston (14th Dist.] 1992, writ denied).

Given that the Court has already found that Stephens acted with that care required by Texas

---

[30]Section 41.002(a) states that "this chapter applies to any action in which a claimant seeks damages relating to a cause of action."

law in performing its obligations under the Contract, the Court cannot find that Stephens acted with gross negligence or willful misconduct.

### 5.    Timeliness of the Indemnification Claim

Finally, the Plaintiffs contend that Stephens failed to timely file a proof of claim for indemnification.  For the reasons explained more fully below, the Court disagrees.

The relevant facts are not disputed.  There is no dispute that Stephens timely filed the Stephens Proof of Claim in the Bankruptcy Case on May 13, 2002, thereby seeking to recover the fees and expenses it calculated to be due under the Contract.  (P-278).  A copy of the Contract, including the indemnification rider (Exhibit A to the Contract), was attached to the Stephens Proof of Claim.  (P-278).  As noted previously, the Contract expressly stated that e2 would indemnify Stephens in accordance with "the indemnification rider attached as Exhibit A."  (P-66, p. 3).  While there was no express reference on the face of the Stephens Proof of Claim to an indemnity claim, case law supports a finding that the indemnity counterclaim asserted in the Adversary constitutes a valid amendment to the Stephens Proof of Claim.

In *In re Hemingway Transport, Inc. et al. v. Kahn, et al.*, 954 F.2d 1, 10 (1st Cir. 1992) (subsequent history omitted), the court held that a proof claim that attached an underlying contract referencing an indemnification clause was sufficient to give reasonable notice of the creditor's contingent claim for indemnification.  By way of background, Hemingway Transport, Inc. ("Hemingway") leased certain real property from Woburn Associates ("Woburn"), the owner of the

property. *Id.* at 3. The lease contained a clause indemnifying Woburn from all attorney's fees it incurred as a consequence of Hemingway's occupation of the property. *Id*. Woburn subsequently sold the real property to Bristol Terminals, Inc. ("Bristol"), a subsidiary of Hemingway, in exchange for a note secured by a second lien on the real property. *Id.* The second lien documents expressly referenced the lease. *Id.* at 9.

Hemingway and Bristol eventually filed for protection under Chapter 11 of the Bankruptcy Code, and their cases were jointly administered. *Id.* at 3. Woburn timely filed a proof of claim based upon its secured note. *Id.* Woburn did not file a separate proof of claim for indemnity based upon the indemnification clause contained in the lease. *Id.* And, the face of Woburn's timely filed claim did not expressly reference its indemnity claim.

Bristol, while acting in its capacity as debtor in possession, sold the property to Juniper Development Group ("Juniper"). *Id.* Seven months after the sale, the Debtors voluntarily converted their Chapter 11 cases to Chapter 7, and a Chapter 7 Trustee was appointed. *Id.* Juniper subsequently filed an adversary proceeding against the Hemingway-Bristol estate for indemnification of costs associated with an environmental clean-up Juniper conducted pursuant to an order issued by the Environmental Protection Agency. *Id.* The trustee filed a third party complaint against Woburn, alleging Woburn was a potentially responsible third party. *Id.* at 4. Woburn counterclaimed against the trustee, asserting, for the first time, the applicability of the indemnification clause found in the lease, seeking to shift any of Woburn's potential liability to Hemingway and "to hold Woburn harmless for the attorney fees incurred in defending against the trustee's third party action." *Id.* The bankruptcy court found the indemnification clause was applicable and awarded Woburn the right to recover $51,395.84 in attorney fees from the estate. *Id.* Woburn argued that its

**Memorandum Opinion and Order**                                                                 **Page 52**

attorney fees were entitled to priority as an administrative expense. *Id.* The bankruptcy court denied administrative priority status because the counterclaim for attorney fees arose out of Woburn's prepetition claim for indemnification. *Id.* Woburn appealed and "[t]he trustee cross-appealed, asserting that Woburn's failure to file a timely proof of claim under its lease indemnification agreement with Hemingway barred any distribution to Woburn." *Id.*

On appeal, the district court affirmed the bankruptcy court's denial of administrative status and dismissed the trustee's cross-appeal "on the ground that Woburn was not the holder of a "claim" for attorney fees against Hemingway at the commencement of the case, see 11 U.S.C. § 101(4), and that '[i]t would be unjust to punish Woburn for its failure to predict this lawsuit several years before its filing.'" *Id.* And, on further appeal, the First Circuit affirmed both courts, concluding that Woburn had asserted its indemnification claim in a timely fashion for three reasons. First, Woburn held a contingent claim for indemnification at the time of the bankruptcy filing. *Id.* at 7-9. Second, the second lien documents attached to Woburn's timely filed proof of claim expressly stated that the second lien was subject to the lease. *Id.* at 9. Third, the counterclaim filed in the adversary proceeding served as a valid amendment to Woburn's timely filed proof of claim. *Id.* at 10.

Thus, this Court concludes that Stephens' counterclaim for indemnification in the Adversary served as a valid amendment to the Stephens Proof of Claim. Given the attachment of the Contract (and its indemnification rider) to the Stephens Proof of Claim, that proof of claim was sufficient to give reasonable notice of Stephens' contingent indemnity claim to e2 (and the Trustee as its successor). By reviewing the Contract attached to the Stephens Proof of Claim, e2 (and the Trustee as its successor), was on notice of Stephens' indemnification rights under the Contract. Accordingly, the Court concludes that the Trustee was on notice of Stephens' contingent indemnity claim when

it entered into the settlement agreement with Stephen Flory, CBI Eastchase LLC, Farris, Cordes, Bonner, Browne, and Clarendon National Insurance Company, (D-301), which terminated the estate's rights to indemnity under the Clarendon insurance policy.[31] The Trustee is not prejudiced by considering Stephens' counterclaim as a valid amendment to the Stephens Proof of Claim.

Prior to trial, the parties agreed that a further hearing would be held regarding the amount of Stephens' indemnity claim based upon a recovery of attorneys' fees and expenses, if that became necessary – *i.e.*, if the Court concluded that Stephens was entitled to indemnification here. (PTO, p. 20, ¶ 4). Accordingly, the Court cannot liquidate the amount of Stephens' indemnity claim at this time. A further hearing will be held at which time the Court will hear evidence regarding the proper amount of Stephens' indemnity claim.

## IV.    CONCLUSION

Stephens did not breach the Contract. Stephens did not owe any fiduciary duty to e2. Even if it did, and it breached that duty, the Plaintiffs failed to prove that Stephens' breach was a proximate cause of damages to e2 or a benefit to Stephens. The Stephens Claim is disallowed because Stephens agreed to accept the Note in satisfaction of its claim against e2 under the Contract. However, Stephens is entitled to be indemnified for the reasonable attorneys' fees and expenses it has incurred in defending itself in the Adversary in accordance with the indemnity provisions of the Contract.

The parties are directed to confer with each other to see if an agreement can be reached as to the amount of Stephens reasonable attorneys' fees and expenses. If an agreement is reached,

[31]The Court notes that D-301 was admitted under seal and that this settlement was signed approximately five weeks prior to the filing of the Complaint.

**Memorandum Opinion and Order**                                               **Page 54**

Stephens shall prepare a form of judgment, consistent with this Memorandum Opinion and Order, and tender it to the Court for entry.

If no agreement can be reached, Stephens is directed to contact the Court's courtroom deputy for a setting. At least twenty-one days before that setting, Stephens must submit a detailed statement reflecting the attorneys' fees and expenses for which it seeks reimbursement. Within fourteen days thereafter, the Trustee is required to file a detailed statement identifying the bases of its objection(s) to Stephens' requested attorneys' fees and expenses. At the conclusion of the further evidentiary hearing, if one is required, a judgment will be entered consistent with this Memorandum Opinion and Order.

**SO ORDERED**.

### End of Order ###